No. 2--06--0884          Filed:  9-26-08

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| WILLIAM BRUSS and MARIANNE BRUSS, | ) | Appeal from the Circuit Court |
| | ) | of Du Page County. |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | No. 06--MR--547 |
| | ) | |
| CHESTER JOHN PRZYBYLO, JOHN | ) | |
| SUICH, BEVERLY SUICH, JOE VALDEZ, | ) | |
| CARL SCHAEFFER, BILL KLASKE, | ) | |
| DANIEL MORENO, and DELORES | ) | |
| DOOLEY, | ) | Honorable |
| | ) | Edward R. Duncan, Jr., |
| Defendants-Appellees. | ) | Judge, Presiding. |

_____

JUSTICE O'MALLEY delivered the opinion of the court:

Plaintiffs, William and Marianne Bruss, appeal the order of the circuit court of Du Page County dismissing with prejudice their complaint pursuant to two separate motions to dismiss brought by defendants, Father Chester John Przybylo, John Suich, Beverly Suich, Joe Valdez, Carl Schaeffer, Bill Klaske, Daniel Moreno, and Delores Dooley, under sections 2--615 and 2--619 of the Code of Civil Procedure (Code) (735 ILCS 5/2--615, 2--619 (West 2006)).  Plaintiffs contend that the court erred in dismissing their complaint, because they stated property claims not subject to the ecclesiastical abstention doctrine (see Serbian Eastern Orthodox Diocese for the United States of America & Canada v. Milivojevich, 426 U.S. 696, 49 L. Ed. 2d 151, 96 S. Ct. 2372 (1976)

(explaining the ecclesiastical abstention doctrine)). Plaintiffs also contend that the trial court abused its discretion in dismissing the complaint with prejudice. We affirm.

On April 18, 2006, plaintiffs filed a three-count complaint for declaratory and other relief against defendants. The following facts (taken as true for purposes of our review at this stage in the proceedings (see Abrams v. Watchtower Bible & Tract Society of New York, Inc., 306 Ill. App. 3d 1006, 1011 (1999)) are drawn from plaintiffs' complaint. Defendants are the pastor (Father Przybylo) and members of the board of directors (the remaining defendants) of The Shrine of Christ the King (Shrine), a church located in Winfield, Illinois, in the diocese of Joliet. The Shrine was established "to promote, preserve and extend the use of the Tridentine Latin Mass of the Roman Catholic Church, according to the 1962 or earlier missal and to foster the accompanying knowledge and practices, doctrines, rights and customs at that time of the Roman Catholic Church, and to establish and maintain an independent shrine to accomplish these objectives." We infer from the record that the Shrine, while practicing Roman Catholic rites, is an independent congregation and not part of the Roman Catholic Church. Further, the Shrine was constituted as an Illinois not-for-profit corporation and not as a religious corporation. Plaintiffs attached to their complaint an unsigned copy of the constitution and bylaws of the Shrine.

Plaintiffs alleged that they were members of the Shrine and had been members of the Shrine's board of directors for many years. Plaintiffs alleged that the individual defendants (except Father Przybylo) held themselves out as members of the Shrine and members of the Shrine's board of directors. Plaintiffs alleged that Father Przybylo purports to be an ordained Roman Catholic priest who, beginning in 1996, has been employed by the Shrine as its pastor and as a Roman Catholic priest. Plaintiffs attached to the complaint a copy of the employment contract between Father

Przybylo and the Shrine. The recitals in the employment contract provided that Father Przybylo was seeking and the Shrine was offering employment as a Roman Catholic priest and pastor. The employment contract authorized Father Przybylo to provide daily mass, including Sundays and other holy days of obligation, and to perform the usual and customary priestly duties for the congregation.

Plaintiffs alleged that Father Przybylo was not a member of any Roman Catholic diocese or religious order recognized by the Roman Catholic Church. They further alleged that Father Przybylo did not possess faculties[1] from the Roman Catholic Church, and specifically from the Bishop of the Diocese of Joliet, to practice the rites the Shrine expected and employed him to practice.

Plaintiffs alleged that Father Przybylo was named as a defendant in a civil action in Cook County, and they attached a copy of the Cook County complaint as an exhibit. The Cook County complaint alleged that Father Przybylo had sexually molested an anonymous minor, the plaintiff in the Cook County action.

In count I of their complaint, plaintiffs sought to maintain a derivative action on behalf of the Shrine, notwithstanding the fact that the Shrine was not a named party, either plaintiff or defendant, to the action. In count I, plaintiffs sought the termination or rescission of the employment agreement between Father Przybylo and the Shrine. The thrust of count I is that Father Przybylo never possessed the qualifications or ability to fulfill the terms of the employment agreement. Plaintiffs sought the disgorgement of all compensation and benefits received by Father Przybylo in addition to his termination.

---

[1]Faculties, a term of historical ecclesiastical law, is defined as "[a]n authorization granted to a person to do what otherwise would not be allowed." Black's Law Dictionary 613 (7th ed. 1999).

In count II of their complaint, plaintiffs sought a declaration that the January 2006 election of the Shrine's board of directors was invalid. The thrust of count II appears to be that Father Przybylo improperly influenced, manipulated, and controlled access to voting membership among the persons of the congregation for the purpose of ultimately influencing and controlling who would be elected to the board of directors of the Shrine. In particular, plaintiffs alleged that the 2006 election of members of the board of directors of the Shrine was invalid because too many of the voters were not qualified to be voting members of the Shrine under the Shrine's constitution and bylaws. Plaintiffs alleged that, as a result of the improper 2006 election, the board of directors of the Shrine is neither properly constituted nor elected. Plaintiffs sought the following relief: (1) a review of the membership rolls of the Shrine culminating in a determination of the qualifications of the voting members of the Shrine; (2) a declaration that the January 2006 and subsequent elections are invalid; (3) the appointment of a temporary receiver to oversee and secure the Shrine's assets until valid elections can be held properly; (4) the holding of a proper election allowing the participation of all individuals who would have qualified to vote in an election in 1995 or any time thereafter; and (5) the removal of Father Przybylo from the board of directors and his ejection from the rectory to allow the Shrine to hire a new and qualified priest.

In count III, plaintiffs sought the suspension of Father Przybylo from his duties with the Shrine. Plaintiffs' request for suspension is based on the fact that a complaint alleging sexual improprieties was filed against Father Przybylo. Plaintiffs alleged that it is the practice of the Roman Catholic Church to suspend its clergy while charges like those in the Cook County action are being investigated. Plaintiffs alleged that the remaining defendants breached their fiduciary duties as members of the Shrine's board by failing to suspend Father Przybylo when the Cook County action

was brought to their attention. As relief, plaintiffs requested that Father Przybylo be suspended from his duties pending the Shrine's investigation and resolution of the Cook County action. Plaintiffs also sought a money judgment against the other named defendants for losses or expenses incurred, or to be incurred, defending Father Przybylo against any claims arising out of the Cook County action or any similar suit.

On April 21, 2006, plaintiffs filed an emergency petition for a temporary restraining order and a preliminary injunction. Plaintiffs alleged that, at a regularly scheduled board meeting of the Shrine, defendants improperly amended the minutes of previous meetings by removing references to certain unspecified actions and statements. Plaintiffs also alleged that defendants improperly removed the secretary of the board because she objected to the improper amendments to the minutes of previous meetings. Plaintiffs further alleged that defendants refused to take any action in response to this lawsuit. Plaintiffs requested the prevention of further actions of the board pending the outcome of this action, the prevention of the removal of the Shrine's monetary and religious assets, the appointment of a receiver to secure the assets of the Shrine, the suspension of Father Przybylo from his duties, and the removal of Father Przybylo from any property owned by the Shrine. On April 24, 2006, the trial court denied the petition.

On May 26, 2006, defendants filed a motion to strike the sexual misconduct allegations and to impound the copy of the Cook County complaint, contending that the Cook County action had been improperly filed, had not been resolved, and thus amounted to little more than gossip. About a week later, on June 1, 2006, defendants filed separate motions to dismiss the complaint pursuant to sections 2--615 and 2--619 of the Code. In the section 2--615 motion to dismiss, defendants asserted, among other things, that plaintiffs had not included the Shrine as a necessary party and had

not sufficiently pleaded damages to entitle them to relief. In the section 2--619 motion to dismiss, defendants asserted that (1) plaintiffs lacked standing to prosecute their claims, because they were not currently members of the Shrine and (2) the ecclesiastical abstention doctrine precluded the trial court from deciding the issues raised in plaintiffs' complaint, because, essentially, they involved matters of church governance and doctrine.

On August 10, 2006, the trial court heard argument on the three pending motions. The trial court granted with prejudice both the section 2--615 and the section 2--619 motions to dismiss and denied defendants' motion to strike and impound.

The trial court reasoned that the ecclesiastical abstention doctrine set forth in Milivojevich, 426 U.S. 696, 49 L. Ed. 2d 151, 96 S. Ct. 2372, prohibited civil courts from resolving disputes involving religious law and polity. The trial court reviewed the relief requested in each of the three counts, noting that count I challenged the qualifications of Father Przybylo and sought to nullify the employment contract; that count II requested the trial court to review the membership rolls and determine who was properly a voting member of the Shrine, along with invalidating all elections beginning with the January 2006 election; and that count III requested the trial court to suspend Father Przybylo from his duties as pastor and as board member of the Shrine. The trial court stated that, in counts I, II, and III, the Shrine had disputes with plaintiffs that would require the trial court "to look at [the Shrine's] Constitution and its rules and apply those rules to determine the outcome" of those counts. Additionally, the trial court reasoned that the case presented "a matter which I believe is not a readily decidable issue involving property. *** This [case], however, does involve the interpretation of the congregation's Constitution and the intervention into its internal affairs, all three counts." The trial court held that the ecclesiastical abstention doctrine precluded it from further

involvement in the matter. The trial court further found that plaintiffs lacked standing to bring the claims in the complaint, owing to their expulsion from the membership of the board of the Shrine and from the membership of the Shrine itself. Thus, the trial court granted with prejudice the section 2--619 motion to dismiss. Turning to the section 2--615 motion to dismiss, the trial court did not clearly articulate the facial defects in the pleading that it discerned, but it nevertheless granted with prejudice the motion.

Plaintiffs' counsel immediately asked the trial court whether plaintiffs should bother filing a motion seeking leave to amend the complaint; the trial court stated that such a motion would be unavailing. Plaintiffs timely appeal. We note that, on appeal, plaintiffs contend that the trial court erred in denying them leave to amend, apparently based on this exchange. We believe, however, that in substance plaintiffs are actually asserting that the trial court abused its discretion in dismissing the complaint with prejudice, and we shall proceed with our analysis of plaintiffs' contentions with this understanding.

On appeal, plaintiffs contend that the trial court relied on the affirmative matters that provided the basis for the section 2--619 motion to dismiss in granting the section 2--615 motion to dismiss. Plaintiffs dispute the trial court's findings that the ecclesiastical abstention doctrine bars its involvement and that plaintiffs lacked standing to bring the complaint. Plaintiffs also contend that the trial court erroneously dismissed the action with prejudice instead of allowing plaintiffs the opportunity to further plead.

We review de novo a trial court's decision to grant a section 2--615 motion to dismiss. Oldendorf v. General Motors Corp., 322 Ill. App. 3d 825, 828 (2001). A section 2--615 motion to dismiss "attacks the legal sufficiency of a complaint by asserting that it fails to state a cause of action

upon which relief can be granted." Oldendorf, 322 Ill. App. 3d at 828. In deciding a section 2--615 motion, the trial court is to consider only those facts apparent from the face of the complaint, matters of which the trial court may take judicial notice, and any judicial admissions contained in the record. Oldendorf, 322 Ill. App. 3d at 828. The trial court will take as true all well-pleaded facts alleged in the complaint along with all reasonable inferences that may be drawn from the well-pleaded allegations; the trial court is to view the allegations and inferences in the light most favorable to the plaintiff. Oldendorf, 322 Ill. App. 3d at 828.

Similarly, we review de novo a trial court's decision to grant a section 2--619 motion to dismiss. Zahl v. Krupa, 365 Ill. App. 3d 653, 657 (2006). A section 2--619 motion to dismiss admits the legal sufficiency of the claims but raises defenses or affirmative matters that defeat the claims. Zahl, 365 Ill. App. 3d at 657-58. The questions presented on review of a section 2--619 motion to dismiss are whether there are genuine issues of material fact and whether the defendant is entitled to judgment as a matter of law. Zahl, 365 Ill. App. 3d at 658. Like a section 2--615 motion, when considering a section 2--619 motion, the trial court is to accept as true all well-pleaded facts and to make all reasonable inferences in favor of the plaintiff. Zahl, 365 Ill. App. 3d at 658.

Finally, whether pursuant to section 2--615 or section 2--619, a complaint should be dismissed with prejudice only if it is apparent that the plaintiff can prove no set of facts that will entitle him or her to recover. Village of Roselle v. Commonwealth Edison Co., 368 Ill. App. 3d 1097, 1119 (2006). Where a claim can be stated, the trial court abuses its discretion if it dismisses the complaint with prejudice and refuses the plaintiff further opportunities to plead. Muirfield Village-Vernon Hills, LLC v. K. Reinke, Jr., & Co., 349 Ill. App. 3d 178, 195 (2004). We thus

review the trial court's decision to dismiss a complaint with prejudice for an abuse of discretion. Muirfield Village, 349 Ill. App. 3d at 195.

Before commencing our analysis of plaintiffs' complaint with respect to defendants' motions to dismiss, we initially address an argument defendants raise on appeal. Defendants urge this court to strike all reference to the Cook County action and to strike from the record the copy of the Cook County complaint appended to plaintiffs' complaint. We note that defendants did not file a motion in the trial court to that effect and they did not file a cross-appeal on that issue. Accordingly, we hold that defendants' request is not properly before us on appeal and decline to consider further defendants' contentions on the issue of the Cook County action.

Before engaging with the intricacies of the ecclesiastical abstention doctrine, we briefly deal with the trial court's alternate basis for dismissing the complaint with prejudice pursuant to section 2--619 of the Code: plaintiffs' standing. The trial court held that plaintiffs lacked standing to maintain this action. Below, defendants argued, and the trial court accepted, that plaintiffs pleaded no direct injuries different from those that other members would have experienced. Plaintiffs concede that they have attempted to bring derivative claims on behalf of the Shrine for the conduct they alleged in their complaint. Defendants further reasoned that, because plaintiffs were expelled from the Shrine, they no longer had any standing to bring either individual or derivative actions involving the Shrine. The trial court apparently adopted this rationale, holding that plaintiffs lacked standing because they had been expelled from membership of the Shrine's board of directors and from membership of the Shrine itself. We find this to be error.

Plaintiffs' expulsion occurred, according to the affidavit submitted with defendants' section 2--619 motion to dismiss, in May 2006. This action was filed April 18, 2006, before the expulsion

occurred. At the time the action was filed, plaintiffs were members of both the Shrine and its board of directors. Defendants point to no authority that would retroactively divest plaintiffs of standing in light of actions that defendants had undertaken after a suit had been filed. We hold that plaintiffs had sufficient standing to bring either individual or derivative claims and that the trial court erred in dismissing this action for plaintiffs' lack of standing.

We now consider the trial court's application of the ecclesiastical abstention doctrine. The first amendment to the United States Constitution provides in part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ***." U.S. Const., amend I. The ecclesiastical abstention doctrine is rooted in both the free exercise and the establishment clauses of the first amendment. See Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440, 449, 21 L. Ed. 2d 658, 665, 89 S. Ct. 601, 606 (1969); J. Nowak & R. Rotunda, Constitutional Law §17.12, at 1413 (6th ed. 2000) ("Of course, the government cannot declare which party is correct in matters of religion, for that would violate the principles of both religion clauses. A judicial declaration of such matters would simultaneously establish one religious view as correct for the organization while inhibiting the free exercise of the opposing belief"). The first amendment is applicable to the states by its incorporation into the due process clause of the fourteenth amendment. U.S. Const., amend. XIV; Employment Division, Department of Human Resources v. Smith, 494 U.S. 872, 876-77, 108 L. Ed. 2d 876, 844, 110 S. Ct. 1595, 1598-99 (1990). Illinois has its own constitutional protection of free exercise and prohibition of establishment. See Ill. Const. 1970, art I, §3 ("The free exercise and enjoyment of religious profession and worship, without discrimination, shall forever be guaranteed ***. No person shall be required to attend or support any ministry or place of worship against his consent,

nor shall any preference be given by law to any religious denomination or mode of worship"). "State courts have the authority to interpret their respective constitutional provisions more broadly than United States Supreme Court interpretations of similar Federal constitutional provisions." People v. McCauley, 163 Ill. 2d 414, 426 (1994). Illinois courts, however, construe the protections of article I, section 3, as coextensive with the corresponding protections of the first amendment. See People v. Falbe, 189 Ill. 2d 635, 645 (2000) ("any statute which is valid under the first amendment is also valid under the Constitution of Illinois"). In interpreting the United States Constitution, Illinois courts follow, as they must, the United States Supreme Court, the final arbiter of the Constitution. People v. Nally, 216 Ill. App. 3d 742, 764 (1991). Accordingly, the decisions of the Supreme Court are the touchstone for our understanding of the ecclesiastical abstention doctrine.

The parties agree that the Shrine is a congregational church, independent and autonomous.[2]

---

[2]Congregational polity exists when "a religious congregation ***, by the nature of its organization, is strictly independent of other ecclesiastical associations, and so far as church government is concerned, owes no fealty or obligation to any higher authority." Watson v. Jones, 80 U.S. 679, 722, 20 L. Ed. 666, 674 (1872). Hierarchical polity, on the other hand, exists when "the religious congregation *** is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete in some supreme judicatory over the whole membership of that general organization." Watson, 80 U.S. at 722-23, 20 L. Ed. at 674. Henceforth, by "hierarchical church" we mean a hierarchical polity, not an individual congregation within that polity. Thus, when we speak of the autonomy of a hierarchical church, we mean the autonomy of a hierarchical polity vis-a-vis the state. We are not concerned with the autonomy that individual hierarchical churches lack due

-11-

The parties disagree over whether the Shrine's polity is itself of consequence to this matter. Plaintiffs claim it is, but do not elaborate. Defendants have the correct view, contending that "any church, whether hierarchical or congregational, has the autonomy [to] select the clergy." (Emphasis added.) As we demonstrate below, if the subject matter of an internal church dispute is not appropriate for state intervention, then abstention is equally compulsory whether the church is congregational or hierarchical, and whether the dispute has been addressed by an adjudicatory body, if any, within the church.

As for the subject matter of this dispute, the parties characterize it differently. Plaintiffs claim that the dispute is ultimately about property rights and therefore abstention is unwarranted. See, e.g., Maryland & Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, 396 U.S. 367, 368, 24 L. Ed. 2d 582, 584, 90 S. Ct. 499, 500 (1970) (Brennan, J., joined by Douglas and Marshall, JJ., concurring) ("a State may adopt any one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters" (emphasis in original)). Defendants argue that the dispute is principally about Father Przybylo's fitness as a pastor and about the qualifications of certain purported voting members of the Shrine. Defendants contend, therefore, that improper state involvement in quintessentially ecclesiastical matters is inevitable if this case is adjudicated by our courts. See Bell v. Presbyterian Church (U.S.A.), 126 F.3d 328, 331 (4th Cir. 1997) ("It has thus become established that the decisions of religious entities about the appointment and removal of ministers and persons in other positions of similar theological significance are beyond the ken of civil courts"); Chase v. Cheney, 58 Ill. 509, 537 (1871) (the "constitution intended

_____

to the internal constraints of hierarchical polity.

to guarantee, from all interference by the State, not only each man's religious faith, but his membership in the church").

We begin our analysis by, first, extracting the general outlines of the ecclesiastical abstention doctrine from the decisions of the Supreme Court and, second, reviewing how lower courts have refined those principles. The Supreme Court's major decisions in this area all concern hierarchical churches, but a careful reading of the cases will disclose principles applicable to all manner of church polity.

Our survey begins with Watson v. Jones, 80 U.S. 679, 20 L. Ed. 666 (1872), universally regarded by the federal courts as the genesis of the ecclesiastical abstention doctrine. Watson derived the doctrine from federal common law, but the Court later incorporated Watson's principles into its first amendment jurisprudence. See Milivojevich, 426 U.S. at 710, 49 L. Ed. 2d at 163, 96 S. Ct. at 2381 (applying Watson in a first amendment case); Scotts African Union Methodist Protestant Church v. Conference of African Union First Colored Methodist Protestant Church, 98 F.3d 78, 87 (3rd Cir. 1996) ("later Supreme Court opinions have recognized [Watson's] holding as grounded in concerns of constitutional dimension"). Watson concerned a fracture within the Walnut Street Church, a local congregation of the Presbyterian Church in the United States (PCUSA), a hierarchical polity overseen ultimately by a general assembly, "the highest judicatory" of the PCUSA. Watson, 80 U.S. at 734, 20 L. Ed. at 678. The real property of the Walnut Street Church had been deeded to the church trustees for use in keeping with the fundamental laws of the PCUSA. In May 1865, the general assembly of the PCUSA expressed loyalty to the federal government and denounced slavery. This declaration led the Walnut Street Church to split into pro- and anti-slavery camps. The pro-slavery group, the minority within the church, claimed title to the church property

because its views were more consistent historically with the PCUSA's beliefs. Fractures along the same lines developed in the Presbytery of Louisville and the Synod of Kentucky, the intermediate governing bodies with jurisdiction over the Walnut Street Church. The factions within the Walnut Street Church allied themselves with their corresponding factions within the Presbytery and the Synod. The general assembly declared the pro-slavery contingents within the Synod and the Presbytery illegitimate and excluded them from membership in the assembly. This declaration effectively designated the anti-slavery contingent as the true and legitimate Walnut Street Church and thus the rightful owner of the church property. Watson, 80 U.S. at 722, 20 L. Ed. at 673.

The anti-slavery faction within the Walnut Street Church sued to determine ownership of the church property. During the pendency of the suit, the anti-slavery factions of the Presbytery and the Synod, together with their adherents within the Walnut Street Church, formally separated from the PCUSA and joined a different denomination. Watson, 80 U.S. at 722, 20 L. Ed. at 674.

The Supreme Court held that the controversy was inappropriate for adjudication by civil courts. As with many of its holdings in this area, the Court's holding in Watson is couched in terms particular to hierarchical churches, but the core, determinative principles, which admittedly are somewhat difficult to extract, are not limited to any particular church polity. Facially, the Court's holding in Watson is based on a rule of deference to a church's own prior adjudication of the dispute brought to the civil courts. This, in short, is "procedural deference." Closer examination of Watson, however, discloses a more fundamental rule of deference tied strictly to the subject matter of a dispute, or "subject-matter deference." On the best reading of the Supreme Court decisions, a reading supported by lower federal decisions, the ecclesiastical abstention doctrine fulfills its aim only if subject-matter deference is considered the controlling principle behind the doctrine. Where

the subject matter of a church dispute is not appropriate for secular adjudication, courts must abstain even if the church has not itself taken formal action on the dispute.

The Court in Watson began its analysis by describing how the rule of procedural deference operates based on the organization of the church. The Court began with congregational churches:

"In such cases where there is a schism [in a congregational church] which leads to a separation into distinct and conflicting bodies, the rights of such bodies to the use of the property must be determined by the ordinary principles which govern voluntary associations. If the principle of government in such cases is that the majority rules, then the numerical majority of members must control the right to the use of the property. If there be within the congregation officers in whom are vested the powers of such control, then those who adhere to the acknowledged organism by which the body is governed are entitled to the use of the property." Watson, 80 U.S. at 725, 20 L. Ed. at 675.

Turning to hierarchical churches, the Court said:

"[I]n cases of this character we are bound to look at the fact that the local congregation is itself but a member of a much larger and more important religious organization, and is under its government and control, and is bound by its orders and judgments. There are in the Presbyterian system of ecclesiastical government, in regular succession, the Presbytery over the session or local church, the Synod over the Presbytery, and the general assembly over all. These are called, in the language of the church organs, 'judicatories,' and they entertain appeals from the decisions of those below, and prescribe corrective measures in other cases.

In this class of cases we think the rule of action which should govern the civil courts, founded [on] a broad and sound view of the relations of church and state under our system

of laws, and supported by a preponderating weight of judicial authority is, that, <u>whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them</u>." (Emphasis added.) <u>Watson</u>, 80 U.S. at 727, 20 L. Ed. at 676.

The emphasized language articulates a rule of abstention that appears to combine subject-matter deference with procedural deference. The Court mandates abstention in (1) a certain class of cases (2) decided by church judicatories. But shortly later in the opinion, the Court speaks of subject-matter deference in isolation:

"<u>In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property,</u>[3] <u>and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect.</u> The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is

_____

[3]This is a foreshadowing of the Court's holding in <u>Jones v. Wolf</u>, 443 U.S. 595, 602, 61 L. Ed. 2d 775, 784, 99 S. Ct. 3020, 3025 (1979), quoting <u>Maryland & Virginia Churches</u>, 396 U.S. at 368, 24 L. Ed. 2d at 584, 90 S. Ct. at 500, that the first amendment does not bar courts from " 'settling church property disputes so long as it involves no considerations of doctrinal matters, whether the ritual and liturgy of worship or the tenets of [the] faith.' "

unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to a total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. <u>It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.</u>" (Emphasis added.) <u>Watson</u>, 80 U.S. at 728-29, 20 L. Ed. at 676-77.

The emphasized language at the start of this passage expresses values that are consistent with a subject-matter deference that applies without regard to church structure and procedures. Though procedural considerations occupy the remainder of the passage, the Court would shortly again speak of subject-matter deference in isolation. Criticizing the Kentucky state court in the case for holding that secular abstention from a church controversy is necessary only where "the [church] tribunal acted within its jurisdiction," the Court said:

"[I]t may very well be conceded that if the General Assembly of the Presbyterian Church should undertake to try one of its members for murder, and punish him with death or imprisonment, its sentence would be of no validity in a civil court or anywhere else. Or if it should at the instance of one of its members entertain jurisdiction as between him and another member as to their individual right to property, real or personal, the right in no sense depending on ecclesiastical questions, its decision would be utterly disregarded by any civil court where it might be set up.[4] ***

---

[4]Here again is an allusion to the principle that would be expressly adopted in <u>Jones</u>.

But it is a very different thing where a subject-matter of dispute, strictly and purely ecclesiastical in its character--a matter over which the civil courts exercise no jurisdiction--a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them--becomes the subject of its action. It may be said here, also, that no jurisdiction has been conferred on the tribunal to try the particular case before it, or that, in its judgment, it exceeds the powers conferred upon it, or that the laws of the church do not authorize the particular form of proceeding adopted; and, in a sense often used in the courts, all of [these] may be said to be questions of jurisdiction. But it is easy to see that if the civil courts are to inquire into all these matters, the whole subject of the doctrinal theology, the usages and customs, the written laws, and fundamental organization of every religious denomination may, and must, be examined into with minuteness and care, for they would become, in almost every case, the criteria by which the validity of the ecclesiastical decree would be determined in the civil court. This principle would deprive these bodies of the right of construing their own church laws, *** and would in effect transfer to the civil courts where property rights were concerned the decision of all ecclesiastical questions." (Emphasis added.) Watson, 80 U.S. at 733-34, 20 L. Ed. at 678.

With this, the Court abruptly ended its discussion and decided the case on the more prosaic doctrine of standing, ruling that the plaintiffs no longer had a stake in the property of the Walnut Street Church because they had left the PCUSA. Watson, 80 U.S. at 734, 20 L. Ed. at 678.[5]

---

[5]Likewise, plaintiffs' membership in the Shrine was terminated during the pendency of this lawsuit. However, plaintiffs did not leave voluntarily like the plaintiffs in Watson, but rather were

As we see it, the Court's directive for secular courts to defer to church adjudications of ecclesiastical controversies was just the surface holding of the case. That holding was, of course, valid for the facts in Watson because the controversy had been addressed by a judicatory body of the PCUSA. Unmistakable signs of a broader holding, however, are evident in the instances where the Court enumerates the subjects inappropriate for secular courts without suggesting that the duty to abstain from those subjects depends, in any given case, on where the controversy lies within the procedural channels of the church. In view of these passages, we cannot believe that the Court would have intervened in the Walnut Street Church controversy if the governing body of the PCUSA had not previously acted to settle the division within the denomination. That is, though the applied holding in Watson invokes subject-matter and procedural considerations, the Court's larger discussion reveals that the subject-matter considerations bore the weight of the decision and that the PCUSA's action was nonessential to the outcome.

The Court's next two decisions in this area, Gonzalez v. Roman Catholic Archbishop, 280 U.S. 1, 74 L. Ed. 131, 50 S. Ct. 5 (1929), and Kedroff v. Saint Nicholas Cathedral of the Russian Orthodox Church in North America, 344 U.S. 94, 97 L. Ed. 120, 73 S. Ct. 143 (1952), are straightforward applications of Watson. Like Watson, Gonzalez was decided before the first amendment was incorporated into the fourteenth amendment. The plaintiff in Gonzalez sued a Roman Catholic archbishop, claiming a right to be appointed a chaplain in the archbishop's diocese pursuant to a trust established decades earlier by the plaintiff's ancestor. The archbishop had refused

---

ousted. As we noted above, defendants cite no authority that would permit them to unilaterally divest plaintiffs of standing after they filed their suit.

to appoint the plaintiff because he did not meet the qualifications of a chaplain as set forth in canon law. In a brief discussion, the Court deferred to the archbishop's decision:

"Among the Church's laws which are thus claimed to be applicable are those creating tribunals for the determination of ecclesiastical controversies. Because the appointment is a canonical act, it is the function of the Church authorities to determine what the essential qualifications of a chaplain are and whether the candidate possesses them. In the absence of fraud, collusion or arbitrariness,[6] the decisions of the proper Church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the

---

[6]This narrow exception to abstention was later characterized as dictum in Milivojevich, 426 U.S. at 712, 49 L. Ed. 2d at 164, 96 S. Ct. at 2382. Milivojevich further held that, even if the Court's precedents could be construed as creating an exception to ecclesiastical abstention, the first amendment would not countenance an "arbitrariness" exception that would entail a court determining whether a church "complied with [its] laws and regulations." Milivojevich, 426 U.S. at 713, 49 L. Ed. 2d at 165, 96 S. Ct. at 2382. No Supreme Court case since Milivojevich has discussed an exception to ecclesiastical abstention, leaving lower courts to speculate on the vitality of even the "fraud" and "collusion" aspects of the exception articulated in Gonzalez. See, e.g., Crowder v. Southern Baptist Convention, 828 F.2d 718, 725 n.18 (11th Cir. 1987) (the Supreme Court "left open the possibility" of civil court intervention in cases of fraud or collusion); Abrams, 306 Ill. App. 3d at 1013 ("Milivojevich merely leaves open, but does not endorse, the possibility that limited review might be available in cases of fraud or collusion"). Since plaintiffs do not claim any exception to abstention, we need not determine what remained of the Gonzalez exception after Milivojevich.

secular courts as conclusive, because the parties in interest made them so by contract or otherwise."  Gonzalez, 280 U.S. at 16, 74 L. Ed. at 137, 50 S. Ct. at 7-8. Noting that there was "not even a suggestion that [the archbishop] exercised his authority arbitrarily," the Court found no ground for intervening.  Gonzalez, 280 U.S. at 7-8, 74 L. Ed. at 137, 50 S. Ct. at 8.

Procedural and subject-matter considerations are intertwined in the Court's discussion, yet we cannot imagine that the Court would have intervened if the plaintiff had gone directly to the courts and the "Church authorities" had not previously acted on his petition.  Moreover, we believe the Court would have justified its abstention by reference to the content of the controversy, i.e., the qualifications of clergy.

In Kedroff, the Court was asked to decide whether the right to use and occupy a cathedral in New York was held by the Russian Orthodox Church, a hierarchical denomination whose supreme authority was seated in Moscow, or by the American diocese of that denomination, which had title to the property.  The issue turned on the constitutionality of a New York statute that purported to grant autonomy to the American diocese, which had elected its own ruling prelate.  The Court found that the statute effectively "prohibit[ed] the free exercise of an ecclesiastical right, the Church's choice of [authority]" because it "[b]y fiat *** displace[d] one church administrator with another" and "passe[d] the control of matters strictly ecclesiastical from one church authority to another." Kedroff, 344 U.S. at 119, 97 L. Ed. at 138, 73 S. Ct. at 156.  The Court discussed Watson and quoted from it at length, including this statement:

"In this country the full and free right to entertain any religious brief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of

-21-

morality and property, and which does not infringe personal rights, is conceded to all."
Watson, 80 U.S. at 728, 20 L. Ed. at 676.

According to the Court, Watson:

"radiates *** a spirit of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine. Freedom to select the clergy, where no improper methods of choice are proven,[7] we think, must now be said to have federal constitutional protection as a part of the free exercise of religion against state interference." (Emphasis added.) Kedroff, 344 U.S. at 116, 97 L. Ed. at 136-37, 73 S. Ct. at 154-55.

Consistent with Watson, the Court also recognized the State's special interest in determining property rights:

"There are occasions when civil courts must draw lines between the responsibilities of church and state for the disposition or use of property. Even in those cases when the property right follows as an incident from decisions of the church custom or law on ecclesiastical issues, the church rule controls." Kedroff, 344 U.S. at 120-21, 97 L. Ed. at 139, 73 S. Ct. at 156-57.

---

[7]Here the Court cited Gonzalez's fraud/collusion/arbitrariness exception to the abstention doctrine.

The Court concluded that it should abstain because the dispute was foremost "a matter of ecclesiastical government" that involved property rights only incidentally. Kedroff, 344 U.S. at 115, 97 L. Ed. at 136, 73 S. Ct. at 154.

Here again, the Court's emphasis on what subjects are forbidden to courts was such that we cannot imagine the Court ruling differently had the New York statute purported to confirm rather than abrogate the power of the Russian Orthodox Church over the American diocese. In that scenario, the church hierarchy would not be infringed but the statute nonetheless would be invalid as an attempt by the state to act in matters of church administration.

Next to Watson, the Court's most quoted decision on ecclesiastical abstention is Milivojevich. Milivojevich, like Watson, is a lengthy decision full of lofty pronouncements on the proper stance of the state toward church disputes. In Milivojevich, the Holy Assembly of the hierarchical Serbian Orthodox Church (Mother Church) removed the plaintiff as bishop of the Mother Church's American-Canadian Diocese (Diocese) on grounds of misconduct and reorganized the Diocese into three parts. The plaintiff asked the civil courts to declare these actions invalid because they were not taken according to the Mother Church's constitution and laws. Milivojevich, 426 U.S. at 707-08, 49 L. Ed. 2d at 161-62, 96 S. Ct. at 2379-80.

The Court held that abstention was clearly mandatory under the principles of Watson and its progeny. The substance of the dispute, the Court found, was of ecclesiastical concern. First, as to the defrockment of the plaintiff, the Court observed that "questions of church discipline and the composition of the church hierarchy are at the core of ecclesiastical concern" and that "the bishop of a church is clearly one of the central figures in such a hierarchy." Milivojevich, 426 U.S. at 717, 49 L. Ed. 2d at 167, 96 S. Ct. at 2384. Second, the reorganization of the Diocese "involv[ed] a

matter of internal church government, an issue at the core of ecclesiastical affairs." Milivojevich, 426 U.S. at 721, 49 L. Ed. 2d at 170, 96 S. Ct. at 2386.

The Court did not, however, end its discussion here. The Court consumed a great deal of space criticizing the Supreme Court of Illinois for questioning the Mother Church's procedures. The Illinois court claimed to apply the "arbitrariness" prong of the Gonzalez exception to abstention. The Illinois court found that the removal of the plaintiff was " 'arbitrary' " because it was not " 'in accordance with the prescribed procedure of the constitution and the penal code of the [Mother Church].' " Milivojevich, 426 U.S. at 718, 49 L. Ed. 2d at 168, 96 S. Ct. at 2384, quoting Serbian Eastern Orthodox Diocese for the United States of America & Canada v. Milivojevich, 60 Ill. 2d 477, 503 (1975). According to the Court, the Illinois court should have abstained once it was apparent that the Holy Assembly was the church body "in whose sole discretion the authority to make those ecclesiastical decisions [was] vested." Milivojevich, 426 U.S. at 717-18, 49 L. Ed. 2d at 167, 96 S. Ct. at 2384. The inquiry of the Illinois court into whether "the decisions of the highest ecclesiastical tribunal of a hierarchical church complied with church laws and regulations" was prohibited by "the constitutional mandate that civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." Milivojevich, 426 U.S. at 713, 49 L. Ed. 2d at 165, 96 S. Ct. at 2382.[8]

_____

[8]This, it is generally held, was the internment of the "arbitrariness" component of the Gonzalez exception. See Elvig v. Calvin Presbyterian Church, 397 F.3d 790, 800-01 (9th Cir. 2005) ("Milivojevich made it clear that there was no arbitrariness exception to the First Amendment");

No. 2--06--0884

In two places in the opinion, the Court stated its broader holding. Early in the decision the Court said:

_____

Bell, 126 F.3d at 331 (same); Crowder, 828 F.2d at 725 (same). The Court in Milivojevich still found it appropriate to verify that the church body that took the disputed action was the "final authority" on "matters of church discipline and internal organization." Milivojevich, 426 U.S. at 715-16, 49 L. Ed. 2d at 166-67, 96 S. Ct. at 2383-84. At least one Illinois court, the First District in Ervin v. Lilydale Progressive Missionary Baptist Church, 351 Ill. App. 3d 41 (2004), has not been careful to distinguish what inquiries are permissible under Milivojevich. Ervin holds that courts "can decide whether the proper church authority terminated a pastor." Ervin, 351 Ill. App. 3d at 44. This seems an acceptable paraphrase of Milivojevich, but the Ervin court crosses into error when it later states, without qualification, that "any church *** has the autonomy to select the clergy as long as the method of selection comports with the church's governing law" and that the "first and fourteenth amendments do not prohibit court intervention when the church fails to follow the procedures it has, itself, enacted." (Emphasis added.) Ervin, 351 Ill. App. 3d at 45. This broad license for court intervention is inconsistent with Milivojevich, which holds that courts may not inquire into whether "the decisions of the highest ecclesiastical tribunal of a hierarchical church complied with church laws and regulations" (Milivojevich, 426 U.S. at 713, 49 L. Ed. 2d at 165, 96 S. Ct. at 2382). Likely, Ervin strayed because of its incautious reliance on Kedroff's holding that courts may determine whether "improper methods of choice" were used in the selection of clergy (Kedroff, 344 U.S. at 116, 97 L. Ed. at 136, 73 S. Ct. at 154). Kedroff was citing Gonzalez's fraud/collusion/arbitrariness exception to abstention, but Milivojevich eliminated the arbitrariness aspect of the exception.

-25-

"For where resolution of [a] dispute[] cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them." Milivojevich, 426 U.S. at 709, 49 L. Ed. 2d at 162, 96 S. Ct. at 2380.

In the final paragraph of the case, the Court said:

"[T]he First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them." Milivojevich, 426 U.S. at 724-25, 49 L. Ed. 2d at 171, 96 S. Ct. at 2387-88.

This passage might lead the reader to conclude that abstention from a church controversy is required only where: (1) the controversy concerns a certain subject matter; and (2) the church is hierarchical and its highest tribunals have addressed the controversy. This is not a reasonable reading in the context of the case. In these passages, the Court is not limiting the scope of the abstention doctrine to any particular church polity, or requiring a prior adjudication by the church as a prerequisite to abstention. Such would be grossly inconsistent with the several instances elsewhere in the opinion where the Court stresses, without reference to any particular kind of church or church procedure, that civil courts may not resolve controversies on certain subjects. The Court says, for instance, that

courts must not decide " 'controversies over religious doctrine and practice.' "  (Milivojevich, 426

U.S. at 710, 49 L. Ed. 2d at 163, 96 S. Ct. at 2381, quoting Hull Church, 393 U.S. at 449, 21 L. Ed.

2d at 665, 89 S. Ct. at 606) or "become entangled in essentially religious controversies or intervene

on behalf of groups espousing particular doctrinal beliefs" (Milivojevich, 426 U.S. at 709, 49 L. Ed.

2d at 163, 96 S. Ct. at 2380).  What we believe the Court is doing in the above passages is casting

its rejection of the Gonzalez "arbitrariness" exception in terms particular to hierarchical churches.

The Court is reinforcing the point, which it made in critiquing the Illinois court, that civil courts

must not inquire "whether the decisions of the highest ecclesiastical tribunal of a hierarchical church

complied with church laws and regulations" (Milivojevich, 426 U.S. at 713, 49 L. Ed. 2d at 165, 96

S. Ct. at 2382).  We cannot read Milivojevich as undercutting the Court's holdings in prior cases that,

where the subject matter of a dispute concerns ecclesiastical matters, a court must abstain no matter

the type of church polity involved or the presence or absence of a prior church adjudication of the

controversy.

We note two other important aspects of the Court's decision in Milivojevich.  First, the Court

rejected the Illinois court's purported application of "neutral principles"[9] to the constitutions of the

Mother Church and the Diocese.  The Illinois court had concluded that these documents granted the

Diocese administrative autonomy.  The Court refused to explore the "various church constitutional

provisions relevant to [the Illinois court's] conclusion," for the provisions "were not so express that

---

[9]The "neutral principles" analysis for church property disputes, adumbrated as early as

Watson, would be formally adopted in Jones.  See Jones, 443 U.S. at 603, 61 L. Ed. 2d at 784, 99

S. Ct. at 3025.

the civil courts could enforce them without engaging in a searching and therefore impermissible inquiry into church polity." Milivojevich, 426 U.S. at 721-23, 49 L. Ed. 2d at 170, 96 S. Ct. at 2386-87. It "suffice[d]" that "the final province" on matters of church polity lay with the Holy Assembly. Milivojevich, 426 U.S. at 721, 49 L. Ed. 2d at 170, 96 S. Ct. at 2386.

Second, the Court refused to view the matter as a church property dispute. If the Holy Assembly's decisions implicated property rights, it was "the incidental effect of an ecclesiastical determination that [was] not subject to judicial abrogation, having been reached by the final church judicatory in which authority to make the decision resides." Milivojevich, 426 U.S. at 720, 49 L. Ed. 2d at 169, 96 S. Ct. at 2385-86.

As we have seen, Milivojevich is a somewhat challenging case from which to extract general principles given the Court's repeated couching of the ecclesiastical abstention doctrine in terms of a particular kind of church polity, namely a hierarchy, and more specifically a hierarchy whose highest tribunal, or judicatory authorities, have ruled on the matter. So worded, these holdings say nothing about a duty to abstain in the case of: (1) a hierarchical church whose highest judicatory levels the dispute did not reach before it was brought to the civil courts; (2) a congregational church; or (3) a church, whether hierarchical or congregational, that lacks adjudicatory bodies altogether. The question is whether, under the Court's abstention jurisprudence, a church dispute must have reached a certain position within the church polity before abstention is mandated, or whether the subject matter of the dispute is a sufficient, and perhaps the only appropriate, ground for deference. To use the phraseology we developed above, is procedural deference a necessary or even appropriate component of the abstention doctrine?

We believe, as explained above, that Milivojevich itself answers the question in the negative, albeit impliedly. However, some lower courts applying the abstention doctrine have given significant and sometimes decisive weight to the status of a dispute within the particular polity of the church. For instance, certain decisions have developed a kind of ripeness doctrine that mandates abstention where the dispute has not yet reached the highest level in a hierarchical church. See, e.g., First Baptist Church of Glen Este v. Ohio, 591 F. Supp. 676, 683 (S.D. Ohio 1983) ("Civil courts must insure that an aggrieved church member has exhausted all internal 'rights of appeal' before any inquiry is made into internal church matters. Only after such appeal rights have been exhausted can a court determine that the highest church judicatory body has spoken on the matter"); Williams v. Palmer, 177 Ill. App. 3d 799, 805 (1988) ("if plaintiff has not appealed to higher church tribunals, that is his remedy. [Citation.] If plaintiff has made such appeal and been denied relief, this court must defer to the decision of the church"). Under First Baptist Church and Williams, if the dispute has not made its way through the church channels designated for dispute resolution, abstention is necessary, independently of the subject matter of the dispute.

One court has used procedural considerations to conclude that abstention was not warranted. In Vann v. Guildfield Missionary Baptist Church, 452 F. Supp. 2d 651 (W.D. Va. 2006), the plaintiff sued his church, a congregational polity, for wrongfully terminating him as pastor. The plaintiff alleged that he was fired by a single church official, contrary to the church bylaws that required such a decision to be made by a majority vote of members at a duly called church meeting. The church urged the court to abstain from the suit because it presented an ecclesiastical controversy. The court refused, holding that the abstention doctrine "presupposes that the religious organization itself has acted before immunizing the decision from judicial review." Vann, 452 F. Supp. 2d at 655. The

court acknowledged the Supreme Court's admonition in Milivojevich against a secular court's inquiry "whether the decisions of [the church] complied with church laws and regulations" (Milivojevich, 426 U.S. at 713, 49 L. Ed. 2d at 165, 96 S. Ct. at 2382), but found "an important difference between conducting an inquiry into which part of a religious organization has spoken and asking whether the organization has spoken at all." Vann, F. Supp. 2d at 656 n.5. The court concluded that abstention was unwarranted because the plaintiff's termination, having not been accomplished by vote of the congregation, "was not the decision of a religious entity or church." Vann, 452 F. Supp. 2d at 656.[10]

Vann is without doubt a more radical use of procedural considerations than is seen in First Baptist Church and Williams. In these latter decisions, it was assumed that a dispute concerning "matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law" (Milivojevich, 426 U.S. at 713, 49 L. Ed. 2d at 165, 96 S. Ct. at 2382) is never appropriate for court intervention even where the plaintiff has exhausted all remedies within the church. See First Baptist Church, 591 F. Supp. at 683 ("The scope of review is constitutionally limited so that the civil courts do not adjudicate ecclesiastical matters"); Williams, 177 Ill. App. 3d at 805 ("Appointment [of ministers] is undoubtedly an ecclesiastical matter to which judicial deference is mandated by the first amendment"). That is, procedural considerations provide independent justification for abstention, and they never warrant intervention where subject-matter deference would not.

Under Vann's approach, by contrast, a court may intervene if the church has not formally acted--despite the existence within the church of a genuine controversy over ecclesiastical matters.

---

[10]Vann seemed not to apply an exception to abstention so much as conclude that the doctrine had no application in the first instance because no church action was involved.

Vann is irreconcilable with any intelligent reading of Watson and its progeny, which flatly proscribe court involvement in "matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." Milivojevich, 426 U.S. at 713, 49 L. Ed. 2d at 165, 96 S. Ct. at 2382. Vann's error is in assuming that, where a church has not formally acted, there is no ecclesiastical controversy.

Vann is useful for bringing into sharp relief the error in any approach that conditions abstention on the procedural posture within the church of the dispute in question. If it is repugnant to the first amendment to require a church to have formally acted at all with respect to the dispute before abstention is appropriate, it is a fortiori erroneous to require the dispute to have traversed any kind of appellate process within the church before abstention is warranted. Such a tack reduces the first amendment from a substantive protection of religious conscience, shielding even the most informal of churches, to a crude form of res judicata--a mechanical procedural requirement.

Despite their differences, Vann, First Baptist Church, and Williams share the assumption that a court is permitted to determine when a church has formally acted (Vann) or has taken all available action (First Baptist Church and Williams). The risk in this approach is that it may entail "a searching and therefore impermissible inquiry into church polity" (Milivojevich, 426 U.S. at 723, 49 L. Ed. 2d at 170, 96 S. Ct. at 2387). We recognize that the Court in Milivojevich reviewed the polity of the Mother Church, finding that the Holy Assembly was the final authority on matters of discipline and administration. However, the Court emphasized that the Holy Assembly's preeminence was undisputed by the parties, and the Court issued a stern warning against the entanglement that may result from a civil court's study of a church's polity. See Milivojevich, 426 U.S. at 722-23, 49 L. Ed. 2d at 170-71, 96 S. Ct. at 2386-87. Such an inquiry is undesirable, we

-31-

believe, even if its effect is limited to providing supplemental grounds for abstention that is independently compelled by the subject matter of the dispute.

We believe the more circumspect approach is to rest the abstention decision entirely on the subject matter of the dispute. We are guided here by several lower federal courts that have insightfully explained that the ecclesiastical abstention doctrine, properly understood, applies without regard to the polity of the church from which the dispute arises, or to the status of the dispute within the church's adjudicatory channels, if any. To arrive at such conclusions, these courts have had to extract the core of the ecclesiastical abstention doctrine from its enmeshment with the facts of Watson, Gonzalez, Kedroff, and Milivojevich, which concerned hierarchical polities. Watson and Milivojevich, of course, were faced particularly with adjudications by the highest authorities within the hierarchies.

In Young v. Northern Illinois Conference of United Methodist Church, 21 F.3d 184 (7th Cir. 1994), the Seventh Circuit Court of Appeals construed this frequently quoted passage from Milivojevich:

"[N]o 'arbitrariness' exception--in the sense of an inquiry whether the decisions of the highest ecclesiastical tribunal of a hierarchical church complied with church laws and regulations--is consistent with the constitutional mandate that civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." (Emphasis added.) Milivojevich, 426 U.S. at 713, 49 L. Ed. 2d at 165, 96 S. Ct. at 2382.

The court said:

"The language 'highest judicatories' is derived from Watson ***, which referred to the 'highest *** church judicatories to which the matter has been carried.' In other words, it refers to the body internal to the church which made the final disposition of the matter which subsequently gave rise to the case at hand. It does not mean that a civil court need only defer to the 'highest' decision-making body of the church and may ignore others. Rather, it means that the civil court must defer to the highest body to which the matter had been carried prior to reaching the civil court." (Emphasis omitted.) Young, 21 F.3d at 186-87 n.2.

Accord Lewis v. Seventh Day Adventists Lake Region Conference, 978 F.2d 940, 943 (6th Cir. 1992) (deferring to decision of subordinate authority in hierarchical polity because Watson demands deference to " 'the highest of the[] church judicatories to which the matter has been carried.' [Citation.]" (emphasis omitted)).

Not only is abstention not contingent on an adjudication of a dispute by the highest authority within a church, no formal adjudication at all is necessary. In Nunn v. Black, 506 F. Supp. 444 (W.D. Va. 1981), a congregation of the worldwide Church of God of Prophecy[11] held a meeting and expelled the plaintiffs as members because they falsely claimed to have the gift of glossolalia, or speaking in tongues. The plaintiffs sued, claiming that the expulsion was wrongful because the congregation did not employ the procedures dictated by the church's governing law. The plaintiffs also alleged that, because they had contributed substantial sums of money to the congregation, the expulsion deprived them of their beneficial interest in the church property. The court held that, no

---

[11]From the court's description, the Church of God of Prophecy is a hierarchical church, though the court never labels it as such.

matter how egregiously the congregation may have departed from the proper procedures, the subject matter of the dispute made abstention compulsory. The court said:

"[I]t is certain that the ecclesiastical issue of the validity of the plaintiffs' speaking by inspiration of the Holy Spirit pervades the present controversy and removes it from this court's competence. *** It is the very nature of religious matters that ecclesiastical decisions are accepted as articles of faith, as opposed to the rational, objective mode of analysis and procedure used in secular decision-making. Therefore, in the present case, constitutional concepts of due process, involving secular notions of 'fundamental fairness' or impermissible objectives, are therefore hardly relevant to such matters of ecclesiastical cognizance. [Citation.] Thus, the plaintiffs' contentions that their due process rights were violated in that their contributions to the Church were expropriated by the expulsion is of no merit." Nunn, 506 F. Supp. at 448.

The court immediately added:

"[T]he above conclusion is not varied by the fact that the Church of God of Prophecy has no structured decision-making process." Nunn, 506 F. Supp. at 448.

This is an implicit clarification that, though Watson and Milivojevich concerned adjudications by churches with highly formalized structures, abstention turns on the essence of the dispute brought to the secular courts. Thus, where the subject matter is forbidden to civil courts, the duty to abstain is in no way defeated or diminished by the structure or sophistication of the church, or by the presence or absence of any formal adjudication of the matter within the church itself.[12]

---

[12]At least one court has held that a plaintiff's interest in court involvement is "substantially

Consequently, a congregational church, whatever its formality, enjoys equal protection under the first amendment with a hierarchical church. See Burgess v. Rock Creek Baptist Church, 734 F. Supp. 30, 31 n.2 (D.D.C. 1990) ("the Court can discern no justification for refusing to apply the First Amendment analysis and reasoning of the Supreme Court and lower federal court case law involving hierarchical churches to [congregational churches]"); First Baptist Church of Glen Este, 591 F. Supp. at 682 ("because the 'hands off' policy [of Milivojevich] is of constitutional dimension, we find it difficult to justify the application of a different standard where a congregational church is involved"); cf. 1 W. Bassett, Religious Organizations and the Law §5:48 (1997) ("Only rarely do the courts address the problem of entrenched board majorities who continue in office for years at a time, impervious to recall and unheeding of congregation voices calling for resignation, or new elections. *** Where a church is hierarchical in polity the problem of entrenched directorships is rare because of the possibility of appeal from the local congregation for redress to superior authorities. In hierarchical churches the courts will usually defer to the chain of authority. The problem exists, more properly, in churches of congregational polity. Even here, however, courts will rarely intervene to order an election").

In light of these principles, we are neither more nor less inclined to abstain given that the Shrine is congregational rather than part of a hierarchical polity. Nor is it of moment to us whether

---

lessened" where the dispute has been formally adjudicated by the church. See Crowder, 828 F.2d at 726. As explained above, we think this approach raises an unacceptable risk of state entanglement in matters of church procedure.

the Shrine has formally addressed or adjudicated plaintiffs' grievances. The sole determinant here is the subject matter of the dispute, to which we now turn.

Count I seeks rescission of the employment agreement between the Shrine and Father Przybylo, on the ground that Father Przybylo lacks faculties from the local Roman Catholic bishop. Plaintiffs allege that such faculties are necessary for Father Przybylo to minister as a Roman Catholic priest as specified by the employment contract. Count III alleges that Father Przybylo has been accused of sexual abuse in an unrelated criminal proceeding. Plaintiffs seek the suspension of Father Przybylo because (1) the allegations are "serious and present a threat to the continued operations of the [Shrine]"; and (2) it is the policy of the Roman Catholic Church to suspend clergy so accused pending disposition of the charges. Count II asks for a declaration that certain individuals approved as voting members of the Shrine by Father Przybylo are in fact not qualified for voting membership. Count II also seeks invalidation of the January 2006 election of Shrine board members because individuals not qualified as voting members cast ballots in the election. As is obvious from the complaint, we are directly called on to judge the qualifications and fitness of Father Przybylo to be pastor of the Shrine as well as the qualifications of certain individuals to be voting members of the Shrine.

Civil courts may not involve themselves in "matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." Milivojevich, 426 U.S. at 713, 49 L. Ed. 2d at 165, 96 S. Ct. at 2382. "Religious bodies must be free to decide for themselves, free from state interference, matters which pertain to church government, faith and doctrine." Dowd v. Society of St. Columbans, 861 F.2d 761, 764 (1st Cir. 1988). The qualifications of pastors and members generally fall within these proscribed subjects. As for pastors, the Supreme Court said in Gonzalez: "[I]t is the function

-36-

of the Church authorities to determine what the essential qualifications of a chaplain are and whether the candidate possesses them." Gonzalez, 280 U.S. at 16, 74 L. Ed. at 137, 50 S. Ct. at 7. One commentator has observed:

"The case law is almost entirely consistent. Ministerial qualifications and appointments to church offices are essentially and entirely doctrinal decisions." 1 W. Bassett, Religious Organizations and the Law §7:25 (1997).

This is an accurate summary. See Natal v. Christian & Missionary Alliance, 878 F.2d 1575, 1577 (1st Cir. 1989) ("once a court is called upon to probe into a religious body's selection and retention of clergymen, the First Amendment is implicated"); Bell, 126 F.3d at 331 (Fourth Circuit) ("It has thus become established that the decisions of religious entities about the appointment and removal of ministers and persons in other positions of similar theological significance are beyond the ken of civil courts"); McClure v. Salvation Army, 460 F.2d 553, 558-59 (5th Cir. 1972) ("The relationship between an organized church and its ministers is its lifeblood. *** Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern"); Hutchison v. Thomas, 789 F.2d 392, 396 (6th Cir. 1986) ("The claim here relates to appellant's status and employment as a minister of the church. It therefore concerns internal church discipline, faith, and organization, all of which are governed by ecclesiastical rule, custom, and law"); Young, 21 F.3d at 187 (Seventh Circuit) ("Milivojevich, read in its entirety, holds that civil court review of ecclesiastical decisions of church tribunals, particularly those pertaining to the hiring or firing of clergy, are in themselves an 'extensive inquiry' into religious law and practice, and hence forbidden") (emphasis in original); Kaufmann v. Sheehan, 707 F.2d 355, 358-59 (8th Cir. 1983) ("While there may be some secular aspects *** to the priesthood or clergy, it is apparent that the priest or other

member of the clergy occupies a particularly sensitive role in any church organization. Significant responsibility in matters of faith *** and exercise of religion characterize such positions").

Equally broad is the ban on secular review of member qualifications. See Watson, 80 U.S. at 729, 20 L. Ed. at 676 ("All who unite themselves to [a religious organization] do so with the implied consent to [its] government, and are bound to submit to it"); Burgess, 734 F. Supp. at 33 ("an indispensable part of any church is the collection of individuals who have joined together in worship and constitute the church's membership"); Grunwald v. Bornfreund, 696 F. Supp. 838, 840-41 (E.D.N.Y. 1988) ("The mere expulsion from a religious society, with the exclusion from a religious community, is not a harm for which courts can grant a remedy"); Nunn, 506 F. Supp. at 448 ("it is clear that the plaintiffs have voluntarily submitted to be bound by the decisions of a particular religious society and that they have no recourse for review concerning the validity of their expulsion [from membership] on the issue of their gift of tongues"); Chase, 58 Ill. at 537 (the "constitution intended to guarantee, from all interference by the State, not only each man's religious faith, but his membership in the church").

Plaintiffs do not dispute these propositions, but argue that our deference here is limited because this case "involves a property control dispute over the property and assets belonging to the Shrine of Christ the King between factions of the membership of the local congregation." Plaintiffs invoke the Supreme Court's holding that " 'there are neutral principles of law, developed for use in all property disputes, which can be applied without "establishing" churches to which property is awarded.' " Jones, 443 U.S. at 599, 61 L. Ed. 2d at 782, 99 S. Ct. at 3023, quoting Hull Church, 393 U.S. at 449, 21 L. Ed. 2d at 665, 89 S. Ct. at 606. Because there are no clear signs in Jones or any other decision by the Court that a neutral principles analysis is applicable beyond property cases, we

believe it best to err on the side of expanding rather than restricting first amendment protection. Thus, we follow the several courts that have categorically refused to apply neutral principles where a controversy involves "matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law" (Milivojevich, 426 U.S. at 713, 49 L. Ed. 2d at 165, 96 S. Ct. at 2382). See, e.g., Hutchison, 789 F.2d at 396 ("The 'neutral principles' doctrine has never been extended to religious controversies in the areas of church government, order and discipline, nor should it be"); Burgess, 734 F. Supp. at 32 (following Hutchison and refusing to apply neutral principles to membership dispute). As this case involves subjects impermissible for court review, we decline to even attempt a neutral principles analysis.

We conclude that the ecclesiastical abstention doctrine precludes adjudication of plaintiffs' complaint. The complaint was properly dismissed with prejudice because plaintiffs could not plead any set of facts setting forth this controversy that would avoid the application of the ecclesiastical abstention doctrine. Village of Roselle, 368 Ill. App. 3d at 1119 (a complaint is properly dismissed with prejudice where it is apparent that the plaintiff can prove no set of facts that will entitle him or her to recover). Moreover, because the trial court properly granted defendants' motion to dismiss pursuant to section 2--619 of the Code, we do not need to consider whether the trial court also properly granted defendants' motion to dismiss pursuant to section 2--615 of the Code. Even if the trial court's decision concerning the section 2--615 motion to dismiss were erroneous, it would not affect our ultimate holding, that the trial court properly dismissed with prejudice plaintiffs' complaint.

For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

GROMETER and JORGENSEN, JJ., concur.