[No. 45161-8-I.   Division One.   September 5, 2000.]

PAUL GATES, *Appellant*, v. CATHOLIC ARCHDIOCESE OF SEATTLE, ET AL., *Respondents*.

*Herman L. Wacker*, for appellant.

*Michael A. Patterson, Patricia K. Buchanan*, and *Christopher S. Clemenson* (of *Lee Smart Cook Martin & Patterson, P.S., Inc.*), for respondents.

BECKER, A.C.J. — We are asked to decide whether a secular court has jurisdiction over an employment contract claim against the Roman Catholic Archdiocese of Seattle where the plaintiff, a pastoral assistant for liturgy and music, claims the pastor insisted he do more work than he had agreed to perform. Because hearing the dispute would necessarily entangle the court in matters of church doctrine and practice, we conclude it was properly dismissed on summary judgment for lack of jurisdiction.

■ Summary judgment is appropriate only if there is no genuine issue of fact and the moving party is entitled to judgment as a matter of law. In reviewing the order, we consider the facts in the light most favorable to the non-moving party. *City of Seattle v. Dep't of Labor & Indus.*, 136 Wn.2d 693, 696-97, 965 P.2d 619 (1998).

Paul Gates worked as pastoral assistant for music for the St. Joseph Parish of the Seattle Archdiocese from 1990 to 1993. When Father Craig Boly became the pastor at St. Joseph, he decided to combine Gates' position with the position of Liturgy Director. The new combined position required the employee to assist Father Boly not only with music but also with liturgy, i.e., the task of sanctifying the public worship of God. Gates resigned because he felt that the combined position was too much work for one person to perform adequately.

A year after Gates resigned, he learned the combined position was again open, and that it had a new job description. The job description began, "The Pastoral Assistant for Liturgy and Music provides for the spiritual needs of St. Joseph parish especially in the areas of liturgy and music. The incumbent plans, implements, and evaluates all aspects of the liturgical life of the parish in coordination with other pastoral staff." The description then set forth specific job responsibilities. The organist was now assigned to direct one of the choirs and was also responsible for planning the music for two of the services. Gates believed that this change would reduce the workload by 10 to 15 hours per week.

Before accepting the position, Gates proposed that the job description be modified further to eliminate the responsibility of preparing families for infant baptisms. Father Boly agreed to this change, and Gates accepted the position on the new terms. He signed an employment agreement specifying his annual salary and benefits.

For a year or so, the relationship between Gates and Father Boly was satisfactory. Their amicable working relationship deteriorated in early 1996 when Father Boly began to pressure Gates to take on additional responsibilities at the church. Father Boly wrote a performance evaluation of Gates that commended him for dedication and excellence in many aspects of his work. But Father Boly also said he felt at times as if he were working for Gates, and as if it were his responsibility to meet the expectations that Gates had set. He encouraged Gates to be more flexible. Father Boly wrote in his evaluation, "Perhaps we need to keep clarifying my conviction that you and I share the planning and implementation of liturgy in the parish, but because the liturgy is ultimately my responsibility, the final decisions need to be ones that I make."

Gates responded to the evaluation by commending Father Boly for many of his good qualities as a pastor. Gates stated, however, that he felt the administration could be improved. He recommended that Father Boly "find ways to

support the pastoral staff in observing good boundaries around their work, especially in regards to time"; that he "consider the results of his requests for more work from the staff in terms of staff morale, professional respect, and the issue of justice"; and that he "consider the consequences of his initiatives before attempting to implement them."

By the end of summer, Father Boly was documenting the discussions he and Gates had in their weekly supervisory meetings. The evidence on which Gates relies to prove a violation of his employment agreement consists primarily of letters written by Father Boly to Gates during August and September, 1996.

In the first letter, dated August 8, Father Boly informed Gates that he wanted him to help develop a community survey on the church's summer mass schedule and liturgical dance, in addition to Gates' "summer goals" of recruiting and training funeral ministers. He reminded Gates, who was responsible for coordinating the bereavement ministry, that recruiting a funeral coordinator for the memorial services should be a priority. Father Boly also stated that he wanted to discuss with Gates the development of children acolytes and having children from the parish school sing at the weekend liturgies once a month. Gates felt Father Boly was assigning new, time-consuming tasks to him at a time when he was already working beyond his capacity.

In the next letter, dated August 24, Father Boly responded to Gates' interest in working toward the role of Pastoral Associate. He set out the qualifications for that position—leadership in the church and commitment to the practice and spirituality of the religion—and pointed out that Gates already was paid at the level of a pastoral associate. Although the letter is not couched in critical terms, Gates took the letter as implying that Father Boly believed Gates to be both overpaid for his current position and unqualified for promotion to pastoral associate.

Father Boly wrote to Gates again on August 30. He said he would like Gates, who was already directing the choir at the 9 a.m. Sunday mass, to be the cantor at one of the other

weekend masses. According to Gates this duty would have added two hours to his already overburdened weekly workload. Father Boly explained that he wanted Gates to be more visible at the weekend liturgies, in part to share his "gift for singing," but also because "it makes sense" that Gates, as pastoral assistant for music, would perform at least as frequently as the part-time support musicians. "[I]t seems good stewardship of our resources to pay support musicians only to supplement what we are not already paying for in our pastoral assistant's salary." Father Boly explained that he was putting the proposed work adjustment in writing to honor Gates' expressed desire to have time to think such requests over before responding. Father Boly wrote, "I want to talk with you about this when we meet next Tuesday—to know what adjustments in your other work this will mean."

It is apparent from two later letters that both Gates and Father Boly grew increasingly displeased with each other as the result of Gates' resistance to taking on additional work. In a letter dated September 15, Father Boly reflected upon his most recent weekly supervisory meeting with Gates. "I understand you to say that it is difficult for you to do something if I ask you to do it, and that you prefer that I ask you what you think about some possible course of action instead. This leaves me with the feeling that I am working for you, that it is up to me to be so careful in how I talk with you that I am responsible for your feelings." Father Boly suggested they discuss this topic at their next meeting. According to Gates, it was a conversation about communication styles, and Father Boly misquoted him. In the letter, Father Boly also set forth an ambitious 12-point list of his short and long term "goals" for the liturgy, and asked that Gates write up his goals as well. Gates states that when Father Boly used the word "goal" it meant a requirement Gates had to perform, and was not at all optional.

Matters came to a head on September 20, as shown by the last letter from Father Boly to Gates. Father Boly summa-

rized his recollections of the supervisory meeting that morning. He wrote that he began the meeting by asking how he could support Gates' ministry. Gates responded, " 'Stop writing me letters.' " Gates said he felt the letters were not a form of communication but rather were Father Boly's way of controlling him. Gates said he might have to quit because Father Boly was not allowing him to do his job—namely, to plan, implement and evaluate the liturgical programs of the parish. Father Boly responded that Gates' work in providing for the spiritual needs of the parish was to be in collaboration with Father Boly. The two of them agreed that they had completely different interpretations of his job description. Gates wanted to engage in consensus decision making with Father Boly, whereas Father Boly insisted on his ultimate authority as pastor. He wrote that if Gates did not agree, then Gates would need to make a decision whether he wanted to continue working in a setting such as St. Joseph's. Father Boly ended by saying the letter was the first step in the Parish Personnel Corrective Action Procedure. "If I do not see a significant improvement in your willingness to perform your job responsibilities in the collaborative ways that I require," the next step was probation, which could lead to termination.

According to Gates, Father Boly suggested that Gates resign. After receiving the letter, Gates felt that termination was inevitable so he left his position. He explained in his resignation letter of September 22 that he had been struggling for a year with Father Boly's use of authority and his "understanding of collaboration and collegiality." Father Boly accepted Gates' resignation.

Gates thereafter filed a complaint against the Archdiocese. He claimed that Father Boly unilaterally increased his workload and changed his job duties, in violation of express contract terms and without following the procedures in the personnel manual of the archdiocese. He also alleged that he was constructively discharged by Father Boly's threat to impose discipline on him if he failed to perform the extra work. The Archdiocese moved for sum-

mary judgment. The trial court granted the motion and dismissed the complaint. This appeal followed.

The central issue is whether the superior court has jurisdiction to hear the dispute. The First Amendment provides, in part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. amend. I; *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S. Ct. 900, 84 L. Ed. 1213 (1940). Our courts have interpreted this amendment to prohibit a secular court from asserting jurisdiction over a controversy when doing so would entangle the court in matters of church doctrine and practice. *Org. for Preserving the Constitution of Zion Lutheran Church v. Mason*, 49 Wn. App. 441, 445, 743 P.2d 848 (1987); *Southside Tabernacle v. Pentecostal Church of God*, 32 Wn. App. 814, 817, 650 P.2d 231 (1982). Controversies touching the relationship between a church and its minister are normally avoided by secular courts because the "introduction of government standards to the selection of spiritual leaders would significantly, and perniciously, rearrange the relationship between church and state." *Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985) (court dismissed a discrimination claim brought by an associate pastor after determining that the position was important to the spiritual and pastoral mission of the church). Because the minister is the chief instrument by which the church seeks to fulfill its purpose, matters touching upon the minister's salary, place of assignment, and duties to be performed are not reviewable by a secular court. *McClure v. Salvation Army*, 460 F.2d 553, 558-59 (5th Cir.), *cert. denied*, 409 U.S. 896, 93 S. Ct. 132, 34 L. Ed. 2d 153 (1972) (court dismissed petitioner's Title VII claim for want of jurisdiction). Significant to the present case, this principle applies not just to ordained clergy, but to all employees of a religious institution whose primary functions serve the church's spiritual and pastoral mission. *See Rayburn*, 772 F.2d at 1168.

Secular courts will, however, hear contract and employ-

ment cases arising from a church controversy when no ecclesiastical or doctrinal issues are involved. *Mason,* 49 Wn. App. at 445-46; *see also Minker v. Baltimore Annual Conference of United Methodist Church,* 894 F.2d 1354, 1359-61 (D.C. Cir. 1990). Because the frontier between church doctrine and civil contract law is a sensitive area, a court must determine whether the specific facts of the case present a threat of religious liberty. *See Scharon v. St. Luke's Episcopal Presbyterian Hosps.,* 929 F.2d 360, 363 n.3 (8th Cir. 1991).

The Archdiocese takes the position that the dispute is over who has ultimate authority for the liturgy within the parish, the Pastor or his Pastoral Assistant. The Archdiocese argues that the First Amendment precludes assertion of civil jurisdiction over the dispute because resolving it would necessarily involve an interpretation of religious matters, an inquiry forbidden by the First Amendment. Gates contends that he is trying to enforce nonreligious terms of his employment agreement.

■ The *Mason* case addressed a complaint by church members who sought an injunction against the installation of Pastor Mason, on the basis that the ballot electing him had not been unanimous as allegedly required by the congregation's constitution. The court accepted jurisdiction because it "was simply asked to construe an ambiguous provision in what amounts to a contract between the members of the congregation, dealing with a purely procedural question." *Mason,* 49 Wn. App. at 446. Gates contends that his case, like *Mason,* can be decided without intrusion into the sphere of religion. He argues that the court will not have to evaluate the content of Father Boly's liturgical goals, but will be called upon only to determine whether Father Boly insisted on the performance of tasks that he had expressly agreed Gates would not have to perform.

The primary problem with this argument is that the record simply does not bear out the allegation that Father Boly insisted on the performance of tasks that he had

expressly agreed Gates would not have to perform. Gates accepted a salaried position; there is no evidence of an agreement that he would have to work no more than a certain number of hours per week. Even assuming that Father Boly's various requests in the letters were actually intended as nonnegotiable demands, Gates has not provided evidence that any of them were outside the scope of work he agreed to do as pastoral assistant for liturgy and music. His job description lists a number of specific responsibilities, but nothing in it suggests that the responsibilities listed are exclusive or unalterable, and Gates stated at his deposition that he understood the job description was subject to change.

The specific conditions Gates claims he expressly insisted on were that he would not have to coordinate infant baptisms, and that the organist would do the music for two masses. He does not now assert that Father Boly tried to return these responsibilities to him. Gates further suggests that he had implicitly conditioned his return to St. Joseph's upon having a "reasonable" workload in order to protect his health and the quality of his performance. Assuming that such a condition could be established as a fact, there would still need to be an inquiry into what was a "reasonable" workload for Gates' position as pastoral assistant. The job description provides generally that Gates' job was to plan, implement, and evaluate all aspects of the liturgical life of the parish and to provide for the "spiritual needs of St. Joseph parish." This describes a job whose primary functions serve the church's spiritual and pastoral mission. A court would necessarily have to determine what duties would further the spiritual needs of the parish in the areas of liturgy and music before the court could determine whether the alleged tasks that Father Boly required of Gates went above and beyond Gates' agreed-upon responsibilities and rendered his workload unreasonable. This would require an evaluation of religious scripture, doctrine, and principles. It is precisely the type of searching inquiry that is prohibited by the First Amendment.

■ Gates further claims that the Roman Catholic Church has voluntarily submitted itself to civil jurisdiction because it has adopted a canon that provides that the religious organization should observe the civil law of contracts to the extent that it is not contrary to canon law. But giving deference to a state's substantive law is not equivalent to submitting to the state's jurisdiction.

The Catholic Church is undisputedly a hierarchical organization, and its canon law gives Father Boly, as pastor, sole authority to direct the liturgy in his parish. The essence of Gates' complaint is that he should have been able to plan and direct the liturgy, according to his own priorities, without submitting to Father Boly's authority. A secular court cannot take up that complaint without assuming the power to reorganize the essential principles of the church, an undertaking forbidden by the First Amendment.

In sum, Gates cannot prove his claims in a secular court without having the court entangle itself in matters of church doctrine and practice. His complaint was properly dismissed on summary judgment for lack of jurisdiction.

Affirmed.

COLEMAN and BAKER, JJ., concur.

Review denied at 142 Wn.2d 1026 (2001).