[No. 62848-8-I.  Division One.  June 7, 2010.]

THOMAS RENTZ, JR., ET AL., *Appellants*, v. JANN WERNER ET AL., *Respondents*.

424

*James Fowler* (of *Vandeberg Johnson & Gandara*), for appellants.

*Steven Goldstein* and *Victoria M. Pond* (of *Betts Patterson & Mines PS*); and *Jean Marie Schiedler-Brown*, for respondents.

¶1 DWYER, C.J. — Where the subject matter of a church-related dispute concerns the church's ecclesiastical affairs, the First Amendment requires a civil court to abstain from adjudicating the dispute. The claims herein at issue con-

cern the power of a church minister and the church's membership policies, all issues that are recognized as being at the core of a religious organization's ecclesiastical affairs. Accordingly, we affirm the trial court's summary judgment order of dismissal.

## I

¶2 This case arises out of a dispute between former members of the Aquarian Foundation, a spiritualist church headquartered in Seattle, Washington, with branches in several other locales, and the church's current minister concerning the church's internal governance and membership policies. The church was founded in 1955 by Keith Milton Rhinehart. In 1966, the church filed articles of incorporation with Washington's secretary of state[1] and adopted bylaws governing its internal affairs. The underlying dispute in this case concerns the interpretation of these governing documents as they relate to the minister's power and authority in church affairs. Thomas Rentz and other former church members[2] contend that Jann Werner, the current minister and president, abused her official powers by wrongfully expelling them and other individuals from the church.

¶3 Together, the church's articles of incorporation and its bylaws set forth the purpose of the church as being an organization dedicated to religious study and public worship. The governing documents indicate that the church was formed to conduct classes on the "phenomenon of spirit return" and to conduct "seances" and "spirit communions." The bylaws provide that "THE GOLDEN RULE—in the true spirit of Matthew 22:37–39, must be [the church

---

[1] The parties assert that the church was incorporated as a nonprofit organization pursuant to chapter 24.03 RCW. However, they have not cited to any document in the record that affirmatively establishes the church's organizational status. This lack of clarity is of no moment because, as explained *infra*, this dispute is not appropriate for judicial resolution.

[2] We refer collectively to the plaintiffs-appellants as Rentz.

ministry's] standard in thought, word, feeling and action in all things relating to Church and [the ministry's] activities therein."

¶4 The church's governing documents also establish the church's organizational structure. It consists of five parts: (1) the church membership, (2) the board of directors, (3) three officers, (4) the position of minister or ecclesiastical head, and (5) various "workers" responsible for conducting some of the church's religious activities.

¶5 With respect to the qualification for, and terms of, membership, the governing documents generally provide that membership in the church "shall be open to [all persons] who desire to study the phenomenon of spirit return, subscribing to the teachings thereof." To become a member of the church, individuals must complete an application form requiring them to profess their belief in certain doctrinal teachings of the church. In addition, applicants are required to affirm that they will adhere to, and not attempt to change, church dogma established by Rhinehart. They must "solemnly swear" that they will "support the existing traditions, policies, and teachings of the church as established and evolved by its founder," Rhinehart. Applicants must promise never to "attempt . . . to alter or change the sacred teachings, policies or traditions" of the church "except that which is endorsed by" Rhinehart. Furthermore, applicants must acknowledge that, upon Rhinehart's "retirement or transition or cryonization, the teachings and policies as evolved by him or through him shall forever rule the church." The bylaws provide that "[o]nly members of this Church shall elect the Board of Directors . . . or vote on other matters which may arise or may offer such suggestions to the Board of Directors as may in their judgment seem advisable for the good of the Church."

¶6 The governing documents provide that a five-member board of directors shall manage the church's "secular affairs." Pursuant to the bylaws, at the church's biennial meeting, the church membership shall elect fellow members to two-year terms on the board "upon recommendation

of the ecclesiastical head" or minister. In addition, the bylaws provide that

> [t]he Minister, Dr. Keith Milton Rhinehart, shall be the permanent President of the Board as long as he may live, unless he voluntarily resigns, and may exercise a vote only in case of a tie. In the event the Minister elects to serve as a permanent member of the Board and not as President, then the Board shall elect a President to serve in accordance with these By-Laws with full voting powers.

Further, the board is responsible for setting the minister's salary, approving contractual undertakings between the church and external parties, and amending the bylaws.

¶7 The church's three officers include a president, secretary, and treasurer. According to the bylaws, each officer is to be elected by the church membership to a two-year term at the church's biennial meeting. The president's duties consist of "presid[ing] over all meetings of the Board [of Directors] and all meetings of the Membership." The secretary is responsible for keeping "an accurate record and minutes of all business meetings" and for chairing a committee responsible for maintaining the church's membership rolls. The treasurer is responsible for keeping the church's financial records and arranging for an annual audit. Although the treasurer is not required to be a member of the board of directors, both the president and the secretary are required by the bylaws to sit on the board.

¶8 The church's governing documents specify that the church's minister shall manage its "ecclesiastical affairs." The bylaws do not set forth a procedure for the selection of the minister. However, the articles of incorporation provide the following:

> The ecclesiastical affairs of this Church shall be managed by its Minister, Keith Milton Rhinehart, so long as he is living or until his voluntary resignation, or by such other person as he may appoint or designate; provided, however, that should he become unable, or unwilling upon voluntary resignation, to so appoint or delegate, then in that event, the Board of Directors

shall appoint a successor Minister to manage the ecclesiastical affairs of the Church or a temporary Minister to manage the ecclesiastical affairs of the Church until Keith Milton Rhinehart has become capable of resuming his duties.

According to the bylaws, the minister shall have the power to control the "character and method" of the church's services and all its spiritual work and to select and appoint all church committees and "helpers" in the church's ecclesiastical work.

¶9 The bylaws provide that those "helpers" whom the minister may select include "ministers," "spiritual healers and practitioners," "teachers," and "mediators." Individuals may be eligible for ordination to those positions "upon action by the Board," after passing an examination as to their "moral, intellectual and educational fitness." Further, the bylaws specify that the "examiner shall be the ecclesiastical head of the Church."

¶10 From the date that he founded the church in 1955 until his death in 1999, Rhinehart served as the Aquarian Foundation's sole minister and president. The parties agree that Rhinehart exerted uncontested control over the church during his tenure. However, they disagree as to why Rhinehart was able to do so. Rentz maintains that Rhinehart was able to exercise complete control over the church without facing dissent from among the membership because he was charismatic and persuasive. Werner does not dispute that Rhinehart was persuasive. However, she also attributes Rhinehart's exercise of unfettered control to the church's governing documents and organizational structure, which, she claims, vest unitary power in the minister—power that she now wields as the current minister.

¶11 Shortly before his death, Rhinehart designated Glenn Spaulding to succeed him as minister and president. Although the church membership reelected Rhinehart as president in 1999, at the same time it provisionally elected Spaulding to the position of president in the event of

Rhinehart's death. Thus, when Rhinehart died shortly after the 1999 election, Spaulding became the church's president and minister. Spaulding's tenure, however, was short lived. After only a few months of service, Spaulding resigned as president and minister.

¶12 The board of directors subsequently appointed Werner as president and minister. Unlike Rhinehart's tenure, Werner's tenure as minister and president of the church has been marked by internal tension and conflict as to whether Werner is Rhinehart's ultimate ministerial successor or "spiritual heir." This conflict has resulted in Werner expelling or purporting to expel several individuals from the church's membership.

¶13 In 2008, Rentz commenced this action against Werner, styling it as a "complaint for violation of church bylaws and articles and church member rights," and seeking a judgment that Werner's actions and her interpretation of the church's governing documents are contrary to the church's internal rules. Rentz alleges that Werner, as minister, has unilaterally expelled members who have voiced dissent, questioned her authority, asked to examine the church's financial records and governing documents, or sought to run for church office without her approval. Rentz contends that membership in the church is open to anyone who desires to study the church's belief system, that Werner has no authority to unilaterally expel anyone from the membership, and that even if she did have such authority, the manner in which she exercised it was arbitrary and contrary to church bylaws.

¶14 Rentz also alleges that Werner has declared that she has the power to remove elected board members from office. Such a view, Rentz asserts, is contrary to the statutory procedure for the removal of directors of a nonprofit corporation set forth in RCW 24.03.103(1), which provides that the corporation's members may remove a director by a two-thirds vote. In addition, Rentz contends that neither the minister nor the president shall necessarily have life tenure but, rather, shall serve at the pleasure of the board

of directors and be elected by the membership to a two-year term, respectively. Further, Rentz claims that Werner has violated RCW 24.03.135's record-keeping and disclosure requirements by failing to disclose the church's financial records upon request by interested church members and then expelling these members for having requested such examination.

¶15 Rentz seeks declaratory and injunctive relief. He seeks a judgment declaring that, pursuant to the governing documents and the church's historical practices, Werner may not unilaterally expel church members, may hold the office of president only if elected, and may remain as minister only if properly appointed and retained by the board. He also requests an injunction reinstating as full members in the church all of the individuals expelled by Werner, invalidating the 2005 church election, prohibiting Werner from participating in a new election, and appointing an independent third party to monitor a new election. In addition, Rentz seeks an accounting of church finances, as well as an award of unspecified damages and attorney fees.

¶16 Subsequent to the filing of Rentz's complaint, the parties engaged in discovery. As part of this process, Werner filed a declaration stating her interpretation of the church's governing documents. Werner does not directly dispute Rentz's characterization of her interpretation of the documents or that she has expelled certain members. She contends, however, that all such actions fall squarely within her duty to manage the church's ecclesiastical affairs. Werner claims that, although the bylaws state that the president is to be elected by the membership to a two-year term, she, as minister, is actually president for life because, like Rhinehart before her, she communicates with the "Real Ascended Masters"[3] concerning management of the church's ecclesiastical affairs. Further, Werner asserts, as Rhinehart was president and minister for life and his

---

[3] According to the record, the Real Ascended Masters are spiritual beings who have transcended the cycle of reincarnation central to the church's belief system.

teachings constitute church dogma, she, too, must serve as president and minister for life and, accordingly, her biennial election as president is merely pro forma to confirm that she remains president of the church. She also claims that, as minister, she possesses absolute authority over membership issues as they relate to the church's ecclesiastical affairs. And she asserts that the individuals whom she has expelled were essentially committing heresy.

¶17 The parties subsequently engaged in a series of protracted discovery disputes, most of which concerned Werner's refusal to produce church records. The trial court eventually issued an order to compel production, but Werner never complied with that order. The church, which was not named as a party to this action, moved to quash subpoenas issued against it as well as for a protective order. Then, the parties filed cross motions for summary judgment of dismissal, with Werner urging the trial court to abstain altogether from ruling on the merits of the parties' respective positions because doing so, she argued, would result in the trial court's becoming entangled with the church's ecclesiastical affairs. The trial court granted Werner's motion and dismissed Rentz's complaint with prejudice. It subsequently dismissed Rentz's discovery motion as moot. Rentz appeals.[4]

## II

¶18 We review de novo a trial court's order granting summary judgment. *Estate of Haselwood v. Bremerton Ice Arena, Inc.*, 166 Wn.2d 489, 497, 210 P.3d 308 (2009) (citing *Biggers v. City of Bainbridge Island*, 162 Wn.2d 683, 693, 169 P.3d 14 (2007)). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

---

[4] Rentz's complaint also included claims that Werner had violated the church's historical practices and financially defrauded the church. The trial court granted Werner's separate motions to dismiss those claims. Rentz has not appealed from those orders.

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c); *Owen v. Burlington N. Santa Fe R.R.*, 153 Wn.2d 780, 787, 108 P.3d 1220 (2005).

## III

¶19 Werner contends that the ecclesiastical abstention doctrine—a judicially created doctrine pursuant to which courts abstain from resolving disputes concerning a religious organization's ecclesiastical affairs—applies to this action. In contrast, Rentz argues that application of the doctrine is unwarranted because the Aquarian Foundation lacks a formal adjudicative body within a hierarchical polity that can resolve this dispute and, in any event, the church has not made a decision on the issues raised in the complaint that requires respect or deference from a civil court. We conclude that application of the doctrine is warranted where the subject matter of a dispute concerns a church's ecclesiastical affairs, regardless of whether the church has an adjudicative body in a hierarchical structure that has ruled on the dispute.

¶20 The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."[5] In light of the prohibition against government interference in religious activity, courts have articulated the "doctrine of ecclesiastical abstention." *Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 819 F.2d 875, 878 n.1 (9th Cir. 1987); *see also Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449, 89 S. Ct. 601, 21 L. Ed. 2d 658 (1969) (*Hull*) (stating that "the First Amendment severely circumscribes the role that civil courts may play in resolving church

---

[5] The First Amendment applies to the states through the due process clause of the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S. Ct. 900, 84 L. Ed. 1213 (1940); *First Covenant Church of Seattle v. City of Seattle*, 120 Wn.2d 203, 218, 840 P.2d 174 (1992) (citing *Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 139-40, 107 S. Ct. 1046, 94 L. Ed. 2d 190 (1987)).

property disputes"). Under this doctrine, civil courts generally abstain from adjudicating disputes involving "matters of ecclesiastical cognizance and polity." *Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*, 426 U.S. 696, 698, 96 S. Ct. 2372, 49 L. Ed. 2d 151 (1976); *see also Gates v. Catholic Archdiocese of Seattle*, 103 Wn. App. 160, 166, 10 P.3d 435 (2000) (stating that Washington courts have interpreted the First Amendment to prohibit courts from adjudicating "a controversy when doing so would entangle the court in matters of church doctrine and practice" (citing *Org. for Preserving the Constitution of Zion Lutheran Church of Auburn v. Mason*, 49 Wn. App. 441, 445, 743 P.2d 848 (1987); *Southside Tabernacle v. Pentecostal Church of God*, 32 Wn. App. 814, 817, 650 P.2d 231 (1982))).

¶21 "In Washington, civil courts may adjudicate church-related disputes only if the dispute does not involve ecclesiastical or doctrinal issues." *Elvig v. Ackles*, 123 Wn. App. 491, 496, 98 P.3d 524 (2004) (citing *Gates*, 103 Wn. App. at 166-67). In particular, "civil courts may not adjudicate matters involving a church's selection of its spiritual leaders." *Elvig*, 123 Wn. App. at 496. "[S]ecular courts must avoid controversies between a church and its minister 'because the introduction of government standards to the selection of spiritual leaders would significantly, and perniciously, rearrange the relationship between church and state.'" *Elvig*, 123 Wn. App. at 497 (internal quotation marks omitted) (quoting *Gates*, 103 Wn. App. at 166). Because a church's minister "is the chief instrument by which the church seeks to fulfill its purpose, matters touching upon the minister's salary, place of assignment, and *duties to be performed* are not reviewable by a secular court." *Gates*, 103 Wn. App. at 166 (emphasis added) (citing *McClure v. Salvation Army*, 460 F.2d 553, 558-59 (5th Cir. 1972)). The claims brought by Rentz directly concern the selection of Werner as minister and her powers and duties in that capacity. Therefore, they invite application of the ecclesiastical abstention doctrine.

¶22 However, Rentz contends that the conditions necessary for application of the doctrine are not herein pre-

sented. He asserts that in order for the doctrine to apply, it must be undisputed that the Aquarian Foundation is a hierarchical church in the sense that it is subordinate to a superior adjudicative authority and that a superior religious tribunal must have rendered a decision on the issues raised in the complaint to which a civil court should defer. We disagree.

¶23 The ecclesiastical abstention doctrine originated in *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 20 L. Ed. 666 (1871). *See Hull*, 393 U.S. at 445. In *Watson*, the highest national governing body of the Presbyterian Church settled a property title dispute between two factions of a local congregation, which was subordinate to the national governing body. The national governing body declared one of the factions to be illegitimate and recognized the other faction as the local congregation with title to the church property. *Watson*, 80 U.S. at 722. Although the United States Supreme Court rejected the appeal of the ousted faction on the basis that they had "erected themselves into a new organization" and therefore had no right to the disputed property, *Watson*, 80 U.S. at 734, the Court also observed that "whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them." *Watson*, 80 U.S. at 727.

¶24 In this regard, the Court distinguished between churches with congregational polities and churches with hierarchical polities. *See Watson*, 80 U.S. at 722-23. A church with a congregational polity, "by the nature of its organization, is strictly independent of other ecclesiastical associations, and so far as church government is concerned, owes no fealty or obligation to any higher authority." *Watson*, 80 U.S. at 722. On the other hand, a church polity is hierarchical where "the religious congregation . . . is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a

general and ultimate power of control more or less complete, in some supreme judicatory over the whole membership of that general organization." *Watson*, 80 U.S. at 722-23. The Court concluded that the structure of the national Presbyterian Church was hierarchical and that the decisions of the national governing authority were owed deference. Despite drawing this distinction, the Court also stated that, in the context of a congregational polity, courts are to enforce decisions made "either by a majority of its members or by such *other* local organism as it may have instituted for the purpose of ecclesiastical government." *Watson*, 80 U.S. at 724 (emphasis added).

¶25 The Court subsequently applied the reasoning articulated in *Watson* to other cases involving church-related disputes in which it held that it would be improper for courts to delve into questions concerning religious doctrine and a church's management of its ecclesiastical affairs. *See, e.g., Milivojevich*, 426 U.S. at 713-14; *Hull*, 393 U.S. at 445-47; *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 114-16, 73 S. Ct. 143, 97 L. Ed. 120 (1952); *Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1, 16-17, 50 S. Ct. 5, 74 L. Ed. 131 (1929). Washington courts have similarly applied the principles articulated in *Watson* in concluding that judicial deference or abstention is required in church-related disputes involving questions of religious doctrine. *See, e.g., Presbytery of Seattle, Inc. v. Rohrbaugh*, 79 Wn.2d 367, 371-73, 485 P.2d 615 (1971); *Elvig*, 123 Wn. App. at 499; *Gates*, 103 Wn. App. at 168-69.

¶26 We recognize that the courts deciding those cases emphasized that abstention or deference was appropriate because the character of the church polities involved in those cases was hierarchical. Further, we recognize that this court, in *Southside Tabernacle*, 32 Wn. App. at 821-22, concluded in the context of a property dispute that the character of a church's polity was a question of fact essential to the determination of whether judicial abstention or deference to a church decision was appropriate. *See also*

*Mason*, 49 Wn. App. at 448 (concluding that "unless this court can somehow determine as a matter of law that [a church] belongs to a hierarchical organization," summary judgment is improper). In light of those decisions, Rentz contends that summary judgment was improper because there are genuine issues of fact as to whether the Aquarian Foundation is a hierarchical or a congregational church and whether it contains a tribunal separate from the general membership with authority to settle internal disputes related to church governance. In support of this argument, he points to the bylaw provisions vesting electoral power in the membership and the absence of clear language empowering the minister to expel members or to function as a tribunal to resolve internal disputes.

¶27 However, as explained below, the issues raised by Rentz go to the core of the Aquarian Foundation's ecclesiastical affairs. They specifically concern the composition of the church's membership and the role of the minister in managing the church's ecclesiastical affairs. Whether the church is congregational or hierarchical is not determinative of the manner in which the claims herein brought implicate the First Amendment's protection against state interference in religious belief and practice.

¶28 In the context herein presented, we are persuaded that application of the abstention doctrine does not turn on whether the Aquarian Foundation's polity is properly characterized as congregational or hierarchical or whether its minister had adjudicative power similar to specially constituted church tribunals involved in other cases. In our view, the dispositive issue is whether the subject matter of the dispute is proper for judicial resolution, that is, whether the subject matter of the dispute concerns "matters of ecclesiastical cognizance and polity." *Milivojevich*, 426 U.S. at 698.

¶29 In so holding, we embrace the reasoning of the Appellate Court of Illinois articulated in *Bruss v. Przybylo*, 385 Ill. App. 3d 399, 895 N.E.2d 1102, 324 Ill. Dec. 387 (2008). At issue in *Bruss* was whether it was proper for a trial court to abstain from adjudicating the claims of former

members of an independent religious organization incorporated as a nonprofit corporation under Illinois law that the church's spiritual leader had abused the powers of his office and manipulated the church's board of directors, contrary to church rules, resulting in an improperly constituted board of directors. 895 N.E.2d at 1106, 1110. The church itself had not addressed these claims internally. *Bruss*, 895 N.E.2d at 1123.

¶30 In a well-reasoned and detailed analysis of the myriad decisions concerning the ecclesiastical abstention doctrine, the court explained that the doctrine "fulfills its aim only if subject-matter deference is considered the controlling principle behind the doctrine. Where the subject matter of a church dispute is not appropriate for secular adjudication, courts must abstain even if the church has not itself taken formal action on the dispute." *Bruss*, 895 N.E.2d at 1112. Observing that the United States Supreme Court had "flatly proscribe[d] court involvement in 'matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law,' " *Bruss*, 895 N.E.2d at 1120-21 (quoting *Milivojevich*, 426 U.S. at 713), the court reasoned that a rule making abstention appropriate only where a church authority had previously acted on an issue would be as equally inconsistent with the First Amendment as would be judicial intervention after a religious organization had internally resolved a dispute. *Bruss*, 895 N.E.2d at 1121.

¶31 Therefore, the court concluded,

[i]f it is repugnant to the first amendment to require a church to have formally acted at all with respect to the dispute before abstention is appropriate, it is *a fortiori* erroneous to require the dispute to have traversed any kind of appellate process within the church before abstention is warranted. Such a tack reduces the first amendment from a substantive protection of religious conscience, shielding even the most informal of churches, to a crude form of *res judicata*—a mechanical procedural requirement.

*Bruss*, 895 N.E.2d at 1121; *accord Ad Hoc Comm. of Parishioners of Our Lady of the Sun Catholic Church, Inc.*

*v. Reiss*, 223 Ariz. 505, 224 P.3d 1002, 1009 (Ct. App. 2010) (adopting reasoning in *Bruss* in case involving internal dispute in independent church and holding that abstention is required if the subject matter of the dispute concerns ecclesiastical affairs).

¶32 The reasoning in *Bruss* is consistent with the pronouncement made in *Watson* that

> [i]n this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.

*Watson*, 80 U.S. at 728-29.

¶33 In addition, *Bruss* respects the notion that

> where a subject-matter of dispute, strictly and purely ecclesiastical in its character ... ,—a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them,—becomes the subject of [a church's] action. . . it is easy to see that if the civil courts are to inquire into all these matters, the whole subject of the doctrinal

theology, the usages and customs, the written laws, and fundamental organization of every religious denomination may, and must, be examined into with minuteness and care, for they would become, in almost every case, the *criteria* by which the validity of the ecclesiastical decree would be determined in the civil court. This principle would deprive these bodies of the right of construing their own church laws . . . and would, in effect, transfer to the civil courts where property rights were concerned the decision of all ecclesiastical questions.

*Watson*, 80 U.S. at 733-34.

¶34 Further, courts have interpreted *Watson*'s reference to decisions made by church adjudicative bodies to mean that authority to which a matter has been referred internally, regardless of whether that authority is the highest adjudicative authority within the church. *See Young v. N. Ill. Conference of United Methodist Church*, 21 F.3d 184, 186 n.2 (7th Cir. 1994); *Lewis v. Seventh Day Adventists Lake Region Conference*, 978 F.2d 940, 943 (6th Cir. 1992). It is undisputed that the Aquarian Foundation's governing documents vest power to govern the church's ecclesiastical affairs in its minister. Rentz offers no explanation as to why Werner's decisions concerning ecclesiastical matters do not constitute decisions requiring our respect.

¶35 We are also persuaded that the reasoning in *Bruss* is correct in light of the statement in *Milivojevich* that "inquiry into the procedure[ ] that canon or ecclesiastical law supposedly requires the church judicatory to follow, or else into the substantive criteria by which they are supposedly to decide the ecclesiastical question . . . is exactly the inquiry that the First Amendment prohibits." 426 U.S. at 713.[6] Accordingly, we hold that it is proper for a court to abstain from adjudicating a dispute concerning subject

---

[6] Of course, that is not to say that a court is precluded from adjudicating all disputes potentially implicating religious doctrine or ecclesiastical affairs. In *Milivojevich*, the Court alluded to the possibility that courts might properly review claims that an internal decision concerning an ecclesiastical matter was a product of bad faith or collusion. 426 U.S. at 713. However, Rentz has not alleged that Werner's disputed actions and interpretations of the governing documents are a product of bad faith or collusion.

matter of "ecclesiastical cognizance and polity," *Milivojevich*, 426 U.S. at 698, regardless of the character of a church's polity or its internal adjudicative procedures or whether the church has addressed the issue internally.

## IV

¶36 Now, we turn to the question of whether the subject matter of this dispute warrants abstention. We conclude that it does.

¶37 Courts have recognized a wide variety of subject matter as being ecclesiastical as opposed to secular. Again, in *Watson*, the Court characterized "matter[s] which concern[ ] theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them" as being ecclesiastical in nature. 80 U.S. at 733. Whether a church has properly selected, retained, or terminated the services of a minister or other clergy and whether a minister is in compliance with church rules are recognized as going to the core of the church's ecclesiastical affairs. *See Milivojevich*, 426 U.S. at 713; *Gonzalez*, 280 U.S. at 16; *Elvig*, 123 Wn. App. at 496; *Gates*, 103 Wn. App. at 166; *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 331 (4th Cir. 1997); *Young*, 21 F.3d at 187; *Natal v. Christian & Missionary Alliance*, 878 F.2d 1575, 1577 (1st Cir. 1989); *Dowd v. Soc'y of St. Columbans*, 861 F.2d 761, 764 (1st Cir. 1988); *Hutchison v. Thomas*, 789 F.2d 392, 396 (6th Cir. 1986); *Kaufmann v. Sheehan*, 707 F.2d 355, 358-59 (8th Cir. 1983); *McClure*, 460 F.2d at 558-59. Controversies over membership qualification and expulsion of members from a religious organization present similar problems. *See Watson*, 80 U.S. at 728-29; *Korean Presbyterian Church of Seattle Normalization Comm. v. Sun Young Lee*, 75 Wn. App. 833, 840-42, 880 P.2d 565 (1994); *Burgess v. Rock Creek Baptist Church*, 734 F. Supp. 30, 33 (D.D.C. 1990); *Grunwald v. Bornfreund*, 696 F. Supp. 838, 840-41 (E.D.N.Y. 1988); *Nunn v. Black*, 506 F. Supp. 444, 448 (W.D. Va. 1981).

¶38 The issues raised herein squarely implicate the Aquarian Foundation's management of its ecclesiastical affairs. The contentions that Werner has overstepped her authority or abused her ministerial powers by claiming that she is the church's minister and president for life directly concern the manner of her selection and the church's internal rules concerning the powers of the minister and president. It is undisputed that the minister is responsible for managing the church's ecclesiastical affairs. Therefore, any judicial determination as to the proper scope of the minister's powers would result in state involvement in the church's ecclesiastical affairs. It is impossible to determine whether Werner's interpretation of the governing documents and her conception of her role and powers thereunder is correct without endorsing and therefore establishing a particular religious viewpoint while simultaneously impinging on the right of other individuals to practice their religious beliefs free from state interference. We cannot resolve this interpretive dispute without impermissibly stamping our judicial imprimatur on the issues of what is "in the true spirit of Matthew 22:37–39," or what is consistent with Rhinehart's teachings.

¶39 In the same vein, decisions concerning membership in the Aquarian Foundation are also ecclesiastical in nature. Were a court to grant the relief sought by Rentz—that is, ordering the reinstatement of expelled members—it would take on the role of establishing membership criteria for the church. Such action is inimical to the First Amendment. In addition, a civil court is not in a position to determine whether an individual subscribes to the teachings of spirit return in a manner qualifying him or her for membership in the Aquarian Foundation. Similarly, a civil court lacks the capacity, consistent with the First Amendment, to determine whether an individual has attempted to alter or challenge dogma established by Rhinehart, as such matters concern faith and conscience. Rentz essentially asks us to decide whether some individuals are heretics of the Aquarian belief system. It is not the place of a civil court to decide that question.

¶40 Further, whether Werner abused her authority in expelling members with dissenting viewpoints or whether she acted arbitrarily in doing so is beyond a civil court's adjudicative capacity as limited by the principle of religious freedom. Courts are barred from inquiring into whether a church complied with internal rules in making decisions concerning ecclesiastical affairs. *Milivojevich*, 426 U.S. at 713. Indeed, as the United States Supreme Court commented in *Milivojevich*,

> it is the essence of religious faith that ecclesiastical decisions are reached and are to be accepted as matters of faith whether or not rational or measurable by objective criteria. Constitutional concepts of due process, involving secular notions of "fundamental fairness" or impermissible objectives, are therefore hardly relevant to such matters of ecclesiastical cognizance.

426 U.S. at 714-15 (footnote omitted).

■ ■ ¶41 Nor does the record contain evidence raising a genuine issue of material fact as to whether the Aquarian Foundation complied with financial record-keeping and disclosure requirements of RCW 24.03.135. The record contains the declaration of the church's treasurer and statements from accounting firms attesting that the church undergoes an annual independent audit and that it does not suffer from any financial irregularities. Other than baldly asserting that members may not access the church's financial records, Rentz cites to nothing in the record refuting this evidence or establishing a violation of RCW 24.03.135. Such a bald assertion cannot defeat a motion for summary judgment. *Heringlake v. State Farm Fire & Cas. Co.*, 74 Wn. App. 179, 192, 872 P.2d 539 (1994) (citing *Kyreacos v. Smith*, 89 Wn.2d 425, 429, 572 P.2d 723 (1977)).

¶42 Finally, because the subject matter of Rentz's claims warrant abstention, the discovery-related motions are moot. The trial court did not err.

¶43 Affirmed.

ELLINGTON and APPELWICK, JJ., concur.

Reconsideration denied June 28, 2010.

Review denied at 170 Wn.2d 1007 (2010).